Marsan Realty Corp. v. Commissioner. David Levowitz and Lilian S. Levowitz v. Commissioner.
Marsan Realty Corp. v. Commissioner
Docket Nos. 92671-92673.
United States Tax Court
T.C. Memo 1963-297; 1963 Tax Ct. Memo LEXIS 51; 22 T.C.M. (CCH) 1513; T.C.M. (RIA) 63297; October 29, 1963
Martin D. Cohen, for the petitioners. Alvin C. Martin, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income tax of petitioner Marsan Realty Corp. for the fiscal years ended June 30, 1955, 1956, and 1957 in the respective amounts of $1,493.76, $1,493.77, and $1,493.76, and determined deficiencies in the income tax of petitioners David and Lilian Levowitz, for the calendar years 1954, 1956, and 1957 in the respective amounts of $37,112.76, $15,909.98, and $1,140.52. By amendment to answer filed prior to the trial, respondent claimed increased deficiencies in the income taxes of David and Lilian Levowitz for the years 1956 and 1957 in the respective amounts of $264.36 and $1,093.38 making total deficiencies in issue for these respective years of $16,174.34 *53 and $2,233.90. The issues for decision are: (1) Whether a transfer of rental property, land and building, by Lilian Levowitz in 1954 to a corporation, Marsan Realty Corp., in return for a 100 percent purchase money mortgage constituted a sale of the property or was a transfer of property in return for securities. (2) If the transaction is held to be a transfer of property for securities, whether the nonrecognition of gain provisions of section 351 of the Internal Revenue Code of 1954 apply. (3) If the transaction is held to be a transfer of property for securities and further that section 351 does not apply, whether the gain attributable to the building is taxable as ordinary income under section 1239 of the 1954 Code. (4) If the transaction is held to be a transfer of property for securities, and if gain is to be recognized on the exchange, whether the amount of such gain along with another item of gross income omitted from the tax return exceeds 25 percent of the gross income reported by petitioners David and Lilian Levowitz on their 1954 income tax return. (5) Whether petitioner Lilian Levowitz received ordinary income in the amounts of $614.80 *54 and $2,718.80 during the taxable years 1956 and 1957, respectively, represented by life insurance premium payments made by Marsan Realty Corp. on policies owned by Lilian Levowitz. (6) Alternatively, if the transaction is held to be a bona fide sale, and the bond and mortgage are held to be a true debt, whether petitioners David and Lilian Levowitz made a timely election of the installment method of reporting income under section 453 of the Internal Revenue Code of 1954. (7) Alternatively, if the transaction is held to be a sale and the sale is held to be reportable under the installment method, whether the July 1, 1956, transfer of the bond and mortgage by Lilian Levowitz to a trust for the benefit of her three children constituted a disposition of an installment obligation within the meaning of section 453(d)(1) of the Internal Revenue Code of 1954. (8) Whether Marsan Realty Corp. is entitled to an interest deduction of $3,000 for payments made pursuant to the aforementioned purchase money mortgage for each of its fiscal years ended June 30, 1955, 1956, and 1957. (9) What is the basis of the building received by Marsan Realty *55 Corp. for purposes of determining depreciation deductions for its fiscal years ended June 30, 1955, 1956, and 1957? Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner Marsan Realty Corp. maintains its books of account and files its Federal income tax returns on the basis of a fiscal year ended June 30, using an accrual method of accounting. Its Federal income tax returns for the fiscal years ended June 30, 1955, June 30, 1956, and June 30, 1957, were filed with the district director of internal revenue at Newark, New Jersey. Petitioners David Levowitz and Lilian S. Levowitz are individuals, husband and wife, who reside in Highland Park, New Jersey. They filed joint Federal income tax returns on the cash method of accounting for the calendar years 1954, 1956, and 1957, with the district director of internal revenue at Newark, New Jersey. Their 1954 income tax return was filed on April 14, 1955. From approximately June 1936 to June 30, 1954, inclusive, David Levowitz (hereinafter referred to as David) was engaged in business at 222-226 Easton Avenue, New Brunswick, New Jersey, as a sole proprietor trading under the name of New Jersey *56 Dairy Laboratories. The sole proprietorship was incorporated on July 1, 1954, under the name New Jersey Dairy Laboratories, Inc. David has always been the sole beneficial stockholder of New Jersey Dairy Laboratories, Inc. In October 1943, Lilian Levowitz (hereinafter referred to as Lilian) filed a certificate of conducting a business under the name of Marsan Realty Company, dated September 16, 1943, with the clerk of Middlesex County of New Jersey. The building and land at 222-226 Easton Avenue, New Brunswick, New Jersey, were conveyed on October 18, 1943, by Morris Niederman and Samuel Niederman to Lilian. The total consideration for the sale was $17,500 payment of which was made by a $500 deposit, assumption of a mortgage in the amount of $9,000, and the payment of $8,000 by certified check at the closing of title on October 19, 1943. Lilian had received $10,000 from David on September 10, 1943, to enable her to purchase the Easton Avenue property. Also, David gave $2,000 to Lilian on August 24, 1945, which she used on the same day to reduce the balance of the mortgage on the Easton Avenue property. The $10,000 payment by David to Lilian in 1943 represented a repayment to Lilian *57 for earlier advances made by Lilian to David. From approximately October 1943 until June 30, 1954, the tenants at 222-226 Easton Avenue included David (trading as New Jersey Dairy Laboratories), the occupants of two residential apartments on the second floor, and the occupants of some garages located at the rear of the building. Lilian received monthly rental from David trading as New Jersey Dairy Laboratories of $200 from November 1943 through November 1950 and of $400 from December 1950 through June 1954. During the period from January 1, 1954 to June 30, 1954, Lilian received the following monthly rentals from the other tenants at 222-226 Easton Avenue: Per
Month
Edgar Miller, tenant of Apartment 1
$65.00
L. Santamarina, tenant of Apartment 2
65.00
Garage tenants (two) $7.50 each
15.00 The gross rental income received by Lilian from tenants during the period from January 1, 1954 to June 30, 1954, inclusive, amounted to $3,270. No part of this sum was reported on David and Lilian's 1954 joint Federal income tax return. The following schedule shows the net profit of Lilian, trading as Marsan Realty Company, from her operation of 222-226 Easton Avenue *58 for the period from 1944 through June 30, 1954: Year
Net Profit
Year
Net Profit
Period
Net Profit
1944
$ 902.33
1949
$ 395.78
Jan. 1
1945
952.82
1950
834.63
to
$1,302.04
1946
1,163.04
1951
3,491.09
June 30,
1947
783.96
1952
3,258.94
1954
1948
966.11
1953
3,624.06
As of June 30, 1954, the Easton Avenue property (land and building) had an adjusted basis to Lilian of $13,530, computed as follows: Unadjusted
Depreciation
Adjusted
Basis
Allowed
Basis
Land
$ 2,569.00
$ 2,569.00
Building
15,605.50
$4,644.50
10,961.00
$18,174.50
$4,644.50
$13,530.00
Marsan Realty Corp. was organized under the laws of New Jersey on July 1, 1954. Under its certificate of incorporation filed on July 1, 1954, Marsan's total authorized capital stock consists of 100 shares of Class A common voting stock and 2,400 shares of Class B common nonvoting stock. On July 1, 1954, Marsan Realty Corp. issued 25 shares of Class A common voting stock to Sidney Markley (hereinafter referred to as Markley), 75 shares of Class A common voting stock to David, and 1 share of Class B nonvoting stock to Lilian. The issued *59 certificates were signed by David and Markley, designating themselves as president and secretary, respectively, of Marsan Realty Corp. The one share issued to Lilian was in order to comply with the state law enabling her to serve on the board of directors of the corporation. Markley paid $250 into the corporation by check dated February 5, 1955, in return for the 25 shares of stock he had received. David paid nothing directly to the corporation for his 75 shares. However, the books of Marsan Realty Company (Lilian's sole proprietorship) on June 30, 1954 showed an unexpired insurance premium of $758.33 and a $3,000 liability owing to David. The $3,000 liability represented a loan made by David to Lilian doing business as Marsan Realty Company in 1948. On the books of Marsan Realty Corp. as of July 1, 1954, the $758.33 unexpired insurance premium was set up as an asset, $750 of the amount was offset against the amount due to David, and David was credited with a capital stock payment of $750. Markley is the husband of Lilian's sister. He has been inactive in the affairs of Marsan Realty Corp. and is unfamiliar with the details of its operations. By a deed dated July 1, 1954, Lilian *60 transferred her interest in the Easton Avenue property to Marsan Realty Corp. for which Marsan Realty Corp. caused to be issued to Lilian a 100 percent purchase money mortgage dated July 1, 1954 in the face amount of $75,000, and a bond. The deed conveying title to Marsan Realty Corp. was not recorded until December 13, 1954. The mortgage has never been recorded. Marsan Realty Corp. did not pay Lilian any cash in 1954 in connection with this transaction. The mortgage, in the face amount of $75,000, provides that the mortgagor shall make no payments on account of principal for the first 5 years, but shall pay, "beginning with the sixth year", the annual sum of $7,500 in amortization of principal. The mortgage provides for interest at the rate of 4 percent per annum and, by its terms must be fully discharged by July 1, 1969. The mortgage further provides that the mortgagor will insure the premises against loss or damage by fire in an amount approved by the mortgagee, and assign such insurance policy to the mortgagee or her assigns. The fire insurance policies insuring the Easton Avenue property from July 1, 1954 to date, however, have been owned by Marsan Realty Corp. which has never *61 assigned any certificates of fire insurance to Lilian, or to Markley, David and Lilian, trustees of a trust (mentioned infra) created by Lilian on July 1, 1956 to which Lilian assigned the mortgage. The fire insurance policies do not contain any loss payable clause for the benefit of either Lilian or the aforementioned trustees. The $75,000 face value figure set forth on the purchase money mortgage was an arbitrary amount determined by Herman Holzer, David and Lilian's accountant. The $75,000 sales price was not determined by arm's-length negotiations. No attempt was made by Holzer or anyone else to ascertain the fair market value of the Easton Avenue property on July 1, 1954. The monthly rental of $400 in effect in June 1954 for New Jersey Dairy Laboratories, the principal tenant, was increased to a monthly rental of $750 in July 1954 for New Jersey Dairy Laboratories, Inc., the corporate successor to New Jersey Dairy Laboratories. Holzer, himself, arbitrarily determined the $750 monthly rental figure in July 1954. There were no negotiations in arriving at the $750 monthly rental. The rentals of the other tenants of the Easton Avenue property were not increased in 1954 or at any *62 time since 1954. The $9,000 annual rental paid by New Jersey Dairy Laboratories, Inc., is approximately $2,400 in excess of the fair rental value of the space it occupied. The cash position of Marsan Realty Corp. on July 1, 1954 was zero. The cash position remained at zero until that corporation received rental income for the month of July 1954 of $895 which it used to open a bank account at the First National Bank of Highland Park, Highland Park, New Jersey, on July 29, 1954. Marsan Realty Corp. has never paid any formal salaries to its officers. Holzer determined the capitalization of Marsan Realty Corp. which was stated to be $1,000, $750 credited to David and $250 credited to Markley. The assets held by Marsan Realty Corp. on July 1, 1954, were the land and building with a fair market value not in excess of $42,000, and prepaid insurance of $758.33, against which it had a $75,000 liability, resulting in a net worth of at least minus $32,241.67. The directors of Marsan Realty Corp. from July 1, 1954, to date have been Lilian, David, and Markley. The officers of the corporation on the below-indicated dates as shown by certificates of corporate resolutions dated July 29, 1954, and *63 October 28, 1960, respectively, relating to the authorization of a corporate bank account maintained by Marsan Realty Corp. in the First National Bank of Highland Park, Highland Park, New Jersey, and setting forth the names of the president and treasurer authorized to deal with the corporation's bank account on the corporation's behalf were as follows: July 29, 1954, to
October 28, 1960
October 28, 1960
President
Lilian Levowitz
Lilian Levowitz
Vice President
Sidney M. Markley
Treasurer
Sidney M. Markley
David Levowitz
Secretary
Sidney M. Markley
David Levowitz
Assistant Secretary
Thelma B. Matsu
Cecelia J. Seidel Lilian signed checks numbered 1 to 205, inclusive, of Marsan Realty Corp. from July 29, 1954, to November 1, 1960. Beginning with check numbered 206 dated November 17, 1960, David signed all subsequent checks of Marsan Realty Corp. On September 15, 1955, Lilian signed the income tax return of Marsan Realty Corp. as it president for its fiscal year ended June 30, 1955. Page 3 of the tax return indicates that the corporation's books were in care of Lilian Levowitz, 226 Easton Avenue, New Brunswick, New Jersey. On April 8, 1959, Lilian *64 also signed as president of Marsan Realty Corp. a Form 872 entitled, "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax" for Marsan Realty Corp. for its fiscal year ended June 30, 1955, which signed Form 872 was received by the Internal Revenue Service and signed by an official thereof under date of May 8, 1959. On July 1, 1956, Lilian transferred the bond and $75,000 purchase-money mortgage to a trust for the benefit of her children, Sandra, Martin, and Amy Levowitz, which had Markley, David, and Lilian as its trustees. The trust provides in part as follows: TRUST AGREEMENT made July 1, 1956, between LILIAN LEVOWITZ, hereinafter called the Grantor, and SIDNEY MARKLEY, DAVID LEVOWITZ and LILIAN LEVOWITZ, hereinafter collectively called the Trustees. 1. The grantor, desiring to create trusts for the benefit of her children and for other good and valuable consideration, hereby irrevocably assigns to the trustees the property described in Schedule A attached hereto and made a part hereof, hereinafter termed the trust property in trust for the purposes and on the conditions hereinafter stated. 2. The trustees shall open two separate accounts for the *65 trust property, one of such accounts to be called THE SANDRA, MARTIN AND AMY LEVOWITZ CORPUS ACCOUNT, and the other to be called THE SANDRA, MARTIN AND AMY LEVOWITZ INCOME ACCOUNT, to be held for the primary benefit of SANDRA LEVOWITZ, MARTIN LEVOWITZ and AMY LEVOWITZ, and the trustees shall hold, manage, and invest the trust property, and shall collect and receive the income thereof, and after deducting all necessary expenses incident to the administration of the trusts, shall dispose of the principal and income of the trusts as follows: (A) The trustees or any one of them shall have the right to withdraw money and make payment to any one of the beneficiaries or to all of the beneficiaries in such amounts and at such times as he or they see fit. (B) If any one of the aforesaid beneficiaries shall die during the term of this trust, the trust for his or her benefit shall cease and the corpus thereof shall remain for the benefit of the surviving beneficiaries, except in the event such deceased beneficiary shall leave issue then living, and in that event such issue shall take the place in the trust of the said deceased beneficiary. 3. Notwithstanding anything herein contained to *66 the contrary, the trustees are authorized and empowered in their uncontrolled discretion to hold the property so vested in such minor, or any part thereof, in a separate fund for the benefit of such minor, notwithstanding that such property may consist of investments not authorized by law for trust funds, and to invest and reinvest the same, collect the income therefrom, and during the minority of such minor, to apply so much of the net income thereof to the support, education, and maintenance of such minor as the trustees shall see fit, and to accumulate, invest, and reinvest the balance of the income until such minor shall attain age 21, and thereupon to pay over any accumulated and undistributed income, to such minor, and if such minor shall die before attaining age 21 the income shall be paid over to the estate of such minor. The authority conferred upon the trustees by this paragraph shall be construed as a power only, and shall not operate to suspend the absolute ownership of such property by such minor or to prevent the absolute vesting hereof in such minor. With respect to the administration of any such property which shall vest in absolute ownership in a minor, and which shall *67 be held by the trustees as authorized in this paragraph, the trustees shall have all the powers vested in them under the provisions of Paragraph 4 hereof; and they shall be entitled to commissions at the rates payable to testamentary trustees. * * *
11. Either of the trustees shall have the power to appoint his or her successor trustee. If either of the trustees named herein shall die, resign, become incapacitated, or refuse to act further as trustee hereunder, without having appointed a successor trustee, the other trustee named herein may, but shall not be required to, appoint a successor trustee. Any successor trustee shall have all the duties and powers assumed and conferred in this agreement upon the trustees, including the power in any successor trustee to appoint his own successor. The appointment of a successor trustee shall be made by a duly acknowledged instrument delivered to the primary beneficiaries and to the person, if any, then acting as trustee hereunder. * * *
13. This trust shall be known as a short term trust, which term shall be for the period of thirteen years from the date hereof, and at the termination of such trust the corpus is reverted to the *68 grantor. 14. The trust shall be irrevocable during the term and the grantor hereby expressly waives all rights and powers, whether alone or in conjunction with others, and regardless of when or from what source she may heretofore or hereafter have acquired such rights or powers, to alter, amend, revoke, or terminate the trusts, or any of the terms of this agreement, in whole or in part. To more fully express her intentions, the grantor hereby declares that her purpose in establishing the trusts is to provide her children with a regular income and with material comforts during their lives? and by this instrument the grantor relinquishes absolutely and forever all her possession or enjoyment of, or right to the income from, the trust property, and all her right and power, whether alone or in conjunction with others, to designate the persons who shall possess or enjoy the trust property, or the income therefrom. 15. This trust has been executed and delivered in the State of New Jersey and shall be construed and administered according to the laws of that state. On November 25, 1959, an account was opened in the name of Lilian S. Levowitz in trust for Sandra, Martin, and Amy Levowitz *69 in the special interest department of the First National Bank of Highland Park, Highland Park, New Jersey. Entries in this account are as follows: Date
Withdrawal
Deposit
Interest
11/25/59
$11,000.00
11/ 4/60
$18.34
11/ 4/60
55.09
11/ 4/60
55.36
11/ 4/60
55.64
5/12/61
55.92
5/12/61
56.20
5/12/61
2,866.66
7/11/61
56.48
7/11/61
$9,882.50
9/ 8/61
2,800.00
5/18/62
21.68
5/18/62
35.79
5/18/62
13,187.69
The following is a descriptive itemization of payments or nonpayments made by Marsan Realty Corp.: (a) On September 14, 1955, Marsan Realty Corp. issued its check in the amount of $3,000 to Lilian. Such check bears the notation "Interest on Mortgage", and the proceeds were paid on September 15, 1955, to Lilian, personally. (b) Marsan Realty Corp. did not at any time during 1956 issue a check for interest on the mortgage to Lilian or to any of the trustees of the trust created on July 1, 1956, by Lilian. (c) On September 10, 1957, Marsan Realty Corp. issued its check in the amount of $3,000 to Lilian. Such check bears no particular notation. It was paid September 13, 1957, and the proceeds *70 thereof went to Lilian personally. (d) On September 13, 1958, Marsan Realty Corp. issued its check in the amount of $3,000 payable to "Lilian S. Levowitz, Trustee." Such check bears the notation "Interest on mortgage for year ending June 30, 1958." This check was presented for payment on November 25, 1959, and the proceeds thereof were deposited in the trust bank account at the First National Bank of Highland Park, Highland Park, New Jersey. (e) On September 10, 1959, Marsan Realty Corp. issued its check in the amount of $3,000 payable to "Lilian Levowitz, Trustee." This check was presented for payment on November 25, 1959, and the proceeds thereof were deposited in the trust bank account. It bears the notation, "int. on mtge. for year ended 6/30/59." (f) On November 2, 1959, Marsan Realty Corp. issued its check in the amount of $5,000 to Lilian Levowitz, Trustee. This check was presented for payment on November 25, 1959, and the proceeds thereof were deposited in the trust bank account. It bears the notation, "Mtge. principal pymt." Marsan Realty Corp. did not make any other payments designated as mortgage principal payment to the trustees or any one of the trustees of the trust *71 created by Lilian on July 1, 1956. (g) On September 14, 1960, Marsan Realty Corp. issued its check in the amount of $2,866.66 payable to Lilian S. Levowitz, Trustee, and bearing the notation, "Interest on Mortgage for Year Ending June 30, 1960." This check bears the endorsements of both Lilian Levowitz and Marsan Realty Corp. The proceeds thereof were deposited to the account of Marsan Realty Corp. on September 15, 1960. (h) On May 10, 1961, Marsan Realty Corp. issued its check in the amount of $2,866.66 to Lilian S. Levowitz. This check bears the notation, "Loans Payable (L.L.)." The proceeds of this check were deposited on May 12, 1961, in the trust bank account. (i) On September 6, 1961, Marsan Realty Corp. issued its check in the amount of $2,800 to "Lilian S. Levowitz,trustee for M.S. and A. Levowitz." This check bears the notation "Trustee for Martin, Sandra, and Amy Levowitz." The proceeds thereof were deposited on September 8, 1961, in the trust bank account. (j) Marsan Realty Corp. did not issue a check for interest on the mortgage to Lilian Levowitz, or to Sidney Markley, Lilian Levowitz, or David Levowitz, as trustee of the trust created on July 1, 1956, by Lilian *72 at any time from January 1, 1962, to September 30, 1962. There is no evidence of any check issued by Marsan Realty Corp. for interest on the mortgage subsequent to September 30, 1962. In addition to the payments heretofore set forth, Marsan Realty Corp. made payments as follows: Date
Payee
Amount
Sept. 30, 1954
Home Life Insurance Company
$ 614.80
Mar. 31, 1955
Thomas E. Nora
2,000.00
Oct. 4, 1955
Home Life Insurance Company
614.80
Sept. 26, 1956
Home Life Insurance Company
614.80
Nov. 8, 1957
The Great Western Life Assurance Company
2,718.80
Nov. 4, 1958
The Great Western Life Assurance Company
2,718.80
Nov. 9, 1959
The Great Western Life Assurance Company
2,718.80
Oct. 18, 1960
Home Life Insurance Company
614.80
Nov. 1, 1960
The Great Western Life Assurance Company
2,718.80
May 15, 1961
Home Life Insurance Company
1,688.50
Oct. 10, 1961
Home Life Insurance Company
614.80
Nov. 6, 1961
The Great Western Life Assurance Company
2,718.80
The check to Thomas E. Nora contains the notation "Special Loan." Nora had built a personal residence for David and Lilian and had requested an advance for such services from David. The checks *73 to Home Life Insurance Company and to the Great Western Life Assurance Company were in payment of premiums on insurance policies owned by Lilian insuring the life of David. All of the insurance premium payments were carried on the books of Marsan Realty Corp. as debits to an account entitled "loans receivable" from Lilian. Two of these premium payments of $2,718.80 each for the years 1957 and 1958 had been carried on the books of Marsan Realty Corp. as debits to an account entitled "Life Insurance officers" but were later transferred to the Loans Receivable account. The loans receivable account was credited with $3,000 on June 30, 1957, representing interest due on the mortgage for the fiscal year ended June 30, 1956, which had not been paid. A further credit was made to the loans receivable account on July 1, 1961, of $10,000, representing principal payments due on the mortgage of $2,500 for fiscal year ended June 30, 1960, the balance owing for the fiscal year ended June 30, 1960, after the $5,000 principal payment made in November 1959, and $7,500 principal payment for the fiscal year ended June 30, 1961. The credits of $3,000 and $10,000 made to the loans receivable account *74 do not represent actual payments by Marsan Realty Corp., but were merely offsets made against amounts which had been advanced by Marsan Realty Corp. on behalf of Lilian in the form of insurance premium payments. On the books of Marsan Realty Corp. its mortgage payable account showed mortgage payments to the extent of the $5,000 cash payment and the $10,000 credit offset. Petitioners, David and Lilian, reported both the $5,000 and $10,000 amounts on their income tax returns for the years 1959 and 1961, respectively, on the installment basis. No formal dividends as such were paid from July 1, 1954, to November 8, 1962, by Marsan Realty Corp. to its stockholders. The income tax returns of Marsan Realty Corp. for its fiscal years ended June 30, 1955, to June 30, 1958, inclusive, showed earned surplus of $1,954.47, $3,512.84, $4,412.53, and $5,064.22, respectively. In 1952 and 1953 David made withdrawals from New Jersey Dairy Laboratories in the total amount of $60,000, representing a $15,000 loan to a corporation and $45,000 in payments on a residence occupied by David and Lilian. Both the title to the residence and a $15,000 mortgage covering the corporate loan were put in Lilian's *75 name. Respondent in his notice of deficiency issued to David and Lilian on March 16, 1961 included in their income for 1954 the amount of $62,144.75 as regular income representing gain on the transfer by Lilian of the Easton Avenue property to Marsan Realty Corp. Respondent computed the gain as the excess of $75,000, being respondent's determination of the value of the property Lilian received, i.e., the bond and mortgage, over Lilian's adjusted basis of $12,855.25 for the real estate transferred. On brief, respondent contends the gain on the transfer of the property to Marsan Realty Corp. to be $31,470 instead of $62,144.75. The difference results from respondent's valuing the property Lilian received in exchange at $45,000 instead of $75,000, and by granting Lilian an adjusted basis for the real estate she transferred which both parties agree was $13,530. For 1956 respondent included in David and Lilian's income the amount of $62,144.75 as a long-term capital gain. This determination was on the theory that the transfer by Lilian of the bond and mortgage to the trust constituted a disposition of installment notes under section 453(d)(1) of the Internal Revenue Code *76 of 1954. Respondent concedes that this determination is in error unless it should be held that David and Lilian may report the gain on the transfer of the property to Marsan Realty Corp. on the installment basis. For 1957 respondent included in David and Lilian's income the amount of $3,000 as an amount received from Marsan Realty Corp. Petitioners at the trial conceded the correctness of this determination. By amended answer respondent alleged that the deficiencies for the years 1956 and 1957 determined in the income tax of Lilian and David should be increased since the insurance premium payments by Marsan Realty Corp. in the respective amounts of $614.80 and $2,718.80 on insurance policies owned by Lilian constituted regular income to Lilian which had not been included by Lilian and David in their income as reported or as determined in the notice of deficiency. Respondent determined deficiencies in Marsan Realty Corp.'s income for its fiscal years ended June 30, 1955, 1956, and 1957 by disallowing $3,000 interest deductions for each year and by reducing claimed depreciation deductions on the Easton Avenue property for each year by $1,979.21. Marsan Realty Corp. computed its *77 depreciation deduction by using a $60,000 cost basis for the building and a useful life of 25 years. Respondent determined the depreciation deduction to be $420.79, based on a cost basis for the building of $11,854.54 and a useful life of slightly under 33 years, i.e., a rate of 3.5496 percent. On brief respondent concedes that unless it is determined that the property was received by Marsan Realty Corp. in an exchange with respect to which no gain is recognized under the provisions of section 351 of the Internal Revenue Code of 1954, the proper depreciation deduction for each year is $1,419.84, instead of $420.79. The amount of $1,419.84 is arrived at by using a percentage depreciation rate of 3.5496. Opinion The principal issues in this case arise from the transfer of real estate by the individual petitioners to a newly formed corporation, the corporate petitioner herein. Petitioners contend that the transfer of the realty by Lilian (the deed also being executed by David to dispose of his curtesy rights under New Jersey law) to Marsan Realty Corp. constitutes a sale and that Lilian and David property elected in their 1959 income tax return to report *78 gain on the installment basis. Petitioners further contend that even if there is gain to Lilian and David from the sale which is includable in its entirety in their 1954 income, the assertion of a deficiency against Lilian and David for 1954 is barred by the statute of limitations. The notice of deficiency was mailed more than 3, but less than 6, years from the date the joint income tax return for 1954 of Lilian and David was filed, and, therefore, any assessment of a deficiency is barred, unless there has been an omission in excess of 25 percent of the gross income reported by Lilian and David for the year 1954. [1] It is petitioners' position that if any amount of gain on the sale of the real property is includable in Lilian's income for 1954, the amount thereof plus other items of gross income omitted from Lilian and David's joint income tax return for 1954 is not in excess of 25 percent of their reported gross income. Respondent contends that the transfer of real estate to the Marsan Realty Corp. in return *79 for a purchase money mortgage and bond was not a sale but a transfer of assets for stock or securities, the purchase money mortgage and bond representing in reality an equity interest in the corporation. Respondent further contends that even though the property was exchanged for stock or securities in the corporation, the nonrecognition of gain provisions of section 351 do not apply because immediately after the exchange Lilian did not control the corporation within the meaning of sections 351 and 368(c) in that she did not own at least 80 percent of the voting stock and at least 80 percent of the total number of shares of all other classes of stock of the corporation. [2] Respondent further contends that the gain attributable to the transfer of the building is taxable as ordinary income under section 1239, the building being depreciable property and Lilian along with David, her spouse, being in control of the corporation within the meaning of section 1239 since together they owned more than 80 percent of the value of the outstanding stock. *80 Respondent contends that he has established that the omission of gross income by Lilian and David from their 1954 joint income tax return was in excess of 25 percent of their reported income, and, therefore, his assertion of a deficiency for that year is timely. The facts here show that Lilian in form made a sale of her real property to Marsan Realty Corp. She and David executed a deed transfering the property to the corporation and in return Lilian received an instrument in the form of a mortgage and bond. There is no statute or rule of law providing that for tax purposes a sale of property by a stockholder (even a sole stockholder) or the spouse of a stockholder of a corporation to that corporation will not be recognized as a sale. A bona fide sale of property intended as such, by a stockholder to his corporation, even though the tax advantage may be the reason the property is sold to the corporation instead of contributed to the capital or exchanged for stock, is treated for tax purposes as a sale. Sun Properties v. United States, 220 F. 2d 171 (C.A. 5, 1955). See also *81 Ainslie Perrault, 25 T.C. 439 (1955), affirmed per curiam 244 F. 2d 408 (1957). However, the fact that a taxpayer casts his transaction in the form of a sale and states that he intended a sale is not conclusive. If the form of the transaction so differs from its substance, the actualities govern its tax consequences. 1432 Broadway Corporation, 4 T.C. 1158 (1945), affd. 160 F. 2d 885 (C.A. 2, 1947). Whether a transaction such as here involved is in substance as well as form a sale is essentially one of fact. Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956). Since the burden is on respondent to establish an omission from gross income by David and Lilian for 1954 in excess of 25 percent, petitioners contend that he has the entire burden of establishing no bona fide sale of property in 1954, that gross income was received by Lilian in 1954 because the sale was not bona fide, and the amount of such income received. Respondent recognizes that he has the burden of establishing an omission from gross income by Lilian and David in 1954 in excess of 25 percent and that he can *82 carry this burden only by showing that Lilian derived taxable income in that year from the transfer of real property to Marsan Realty Corp. In the instant case the creditable evidence overwhelmingly indicates that the transfer of the real property by Lilian and David was not a bona fide sale. The stated sales price to Marsan Realty Corp. of the property which had a fair market value not in excess of $42,000 was $75,000. [3]
*83 The only source of receipts of Marsan Realty Corp. with which to make the interest and principal payments called for by the mortgage and bond was rent from the building transferred. Such rent would have been grossly insufficient for this purpose except for the fact that simultaneously with the transfer of the building to Marsan Realty Corp. the rent of David's solely owned corporation, New Jersey Dairy Laboratories, Inc., was increased to an amount which was at least $2,600 a year in excess of a fair rental value of the space occupied by that corporation. In our view these conceded facts are sufficient to show that the transfer of the property by Lilian and David to Marsan Realty Corp. was not a bona fide sale, particularly when the transaction is scrutinized in the light of the community of interest of David and Lilian, husband and wife, and their family relationship to Markley, Lilian's brother-in-law. The actual terms of the sale here involved so strikingly lack any indications of a bona fide sale or business transaction that these facts alone might well overcome other facts indicating that the substance of the transaction was a sale. However, in the instant case the overwhelming *84 weight of the other creditable evidence indicates that no sale was in fact intended by the parties. The evidence establishes that: (1) the deed to Marsan Realty Corp. was not recorded until December of 1954, (2) the mortgage was never recorded, (3) the interest called for under the mortgage was not paid when due and no effort was made to enforce payment, (4) the insurance policies on the property were not assigned to Lilian or her assignees as required by the mortgage, (5) insurance premiums on policies owned by Lilian were paid by Marsan Realty Corp., (6) no down payment was made on the sales price, (7) no principal payments were due until the sixth year after the transfer, (8) in these latter years when there was a default on principal payment no attempt was made to enforce payment, and (9) the money which Lilian had used initially to purchase the property had been supplied by David even though the facts show that David had previously used money of Lilian's in an equal amount. All of these facts indicate the lack of a bona fide sale. We recognize that both Lilian and David stated that a sale was intended but their testimony even in this regard was vague since they stated that the *85 sale was made because of advice from Markley and their accountant. Lilian and David both testified that the purpose of the transaction was to give Lilian an income not dependent upon David's New Jersey Dairy Laboratories, Inc. business, to provide for their children when the children reached college age, and to strengthen David's credit standing. However, under the form that the transaction took, Lilian's income was still dependent on David's business and David's credit standing could hardly be considered as strengthened by ownership of stock in a corporation the liabilities of which exceeded its assets by over $32,000. The payment of the purchase price was clearly dependent not only on rental payments of David's New Jersey Dairy Laboratories business but on rental payments in excess of the fair rental value of the property rented. See Wilhelmina Dauth, 42 B.T.A. 1181 (1940). The trust set up by Lilian was apparently intended to make the interest payments taxable to her children although petitioners now concede that because of certain provisions in the trust instrument the income thereof is taxable to Lilian. In this connection we infer that the close approximation *86 of the yearly excessive rent to the yearly interest to be paid on the mortgage was set with a view to transferring this amount of the income of David's corporate business to the trust. [5] Furthermore, we think a fair inference from the record considering the way principal payments on the mortgage were actually handled is that there was no intention on the part of the parties to pay out the principal of the mortgage in accordance with its terms but rather to use the income of Marsan Realty Corp. to pay personal obligations of Lilian's with the intent to charge principal payments against these items on Marsan Realty Corp.'s books at any time Lilian and David and their advisors deemed it expedient to do so. It was certainly no mere coincidence that the terms of the trust created by Lilian ended at the time principal payments on the mortgage would have been completed if payments had been made under the terms thereof. The same evidence which negates a bona fide sale points toward the existence of an equity interest in Marsan Realty Corp. in Lilian. Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956) affd. 254 F. 2d 51 (C.A. 7, 1958).
*87 The corporation as set up was not only undercapitalized but in fact had no capitalization at all. Cf. Hoguet Real Estate Corporation, 30 T.C. 580 (1958). On July 1, 1954, Marsan Realty Corp. held real estate which we hold had a fair market value of not more than $42,000 and prepaid insurance of $758.33, against which it had a $75,000 liability, resulting in a net worth of minus $32,241.67. The debt was issued for the principal asset of the corporation. Payments to Lilian were dependent on the success of the business; thus Lilian's investment was at the risk of the business. From what appears in the record Lilian participated in the management of the business after the transfer to the corporation, acting as a director and, for a while at least, as president, signing corporate checks and income tax returns. We do not believe the parties intended to create a true indebtedness to Lilian, that Lilian or the trustees to whom the mortgage was transferred would ever enforce the indebtedness on default, as in fact the trustees did not do when the corporation defaulted on principal payments in later years. The conclusion we reach is that Lilian acquired an equity interest in *88 the corporation. Edward G. Janeway, 2 T.C. 197, affd. 147 F.2d 602 (C.A. 2, 1945). Petitioners argue that notwithstanding the lack of capital investment in the corporation the earnings prospects of the corporation were adequate to pay interest and principal to Lilian. However, the earnings prospects were not adequate for those purposes unless the inflated rental paid by David's solely owned corporation to Marsan Realty Corp. is considered as a part of that corporation's prospective earnings. Instead of the increase in rental income to Marsan Realty Corp. being a justification for the high sales price of the property to Lilian, such increased rental and the high sales price are interrelated parts of a device that should be ignored for tax purposes. Petitioners also contend that Marsan Realty Corp. did not default on its mortgage obligation, that the payments made either to the trust or to or on behalf of Lilian more than equalled interest and principal payments due under the mortgage. This argument ignores the fact that on and after July 1, 1956 the trust, not Lilian, held the mortgage, and any payments made thereafter by Marsan Realty Corp. on behalf *89 of Lilian cannot be considered payments on the mortgage. Although petitioners concede that powers over the trust retained by Lilian suffice to make the trust income taxable to Lilian, petitioners do not contend that the trust was a nullity or that legal title to the mortgage did not vest in the trustees, nor from the evidence are we able to treat the trust as a nullity. Petitioners cite Miller's Estate v. Commissioner, 239 F. 2d 729 (C.A. 9, 1956) and Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955) to the effect that the Commissioner may not substitute his judgment for that of the corporate stockholders so as to dictate what portion of a corporation's operations shall be provided for by equity financing rather than debt. The two cases are clearly distinguishable for they did not involve either a sale at a clearly inflated price or a corporation with a minus net worth. Petitioners also place emphasis on the fact that Lilian was not a shareholder of Marsan Realty Corp. and that the thin incorporation doctrine applies only to certificates of indebtedness held by shareholders, citing W. H. Truschel, 29 T.C. 433 (1957). The Truschel case *90 lays down no broad rule that the thin incorporation doctrine applies only to creditors who are also shareholders. In W. H. Truschel, supra, we stated that such was usually the case. However, the very issue in that case was whether the bonds held by an otherwise nonshareholder were nevertheless to be treated as stock, and although in the Truschel case we held the securities to represent a debt and not a stock interest, we did distinguish a similar case, Emanuel N. (Manny) Kolkey, supra, wherein we held that notes received by stockholders in return for all their stock did not represent true indebtedness but that the holders of those notes held an equity capital interest in the corporation which had issued the notes. Since we hold the purchase money mortgages and bond received by Lilian on the transfer of the real estate to Marsan Realty Corp. to represent an equity interest in that corporation, it is necessary to determine whether the nonrecognition provisions of section 351 apply to the transaction. Section 351 provides that no gain or loss shall be recognized *91 if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control of the corporation. Section 368(c) defines "control" for purposes of section 351 to mean ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. Respondent contends that Lilian was the only person who transferred property to the corporation and that she, immediately after the transfer, did not control Marsan Realty Corp. Respondent states that although the mortgage Lilian held is to be treated as an equity interest, it is to be treated as something akin to preferred stock, citing 1432 Broadway Corporation, supra, or, in any event, a nonvoting stock. For this reason respondent asserts Lilian did not control 80 percent of the voting stock, and, consequently, did not control the corporation. The fallacy in respondent's contention is that it is premised upon the fact that Lilian was the only transferor. *92 We find that Lilian, David and Markley acted together in forming Marsan Realty Corp., that all three transferred property to Marsan Realty Corp. and immediately thereafter the three controlled Marsan Realty Corp. [6]
*93 David's contribution was by way of transferring prepaid insurance of a value of slightly over $750 from Lilian to Marsan Realty Corp. and crediting a $3,000 debt owing by Lilian to David with a payment of $750. The record shows that David in 1948 had advanced $3,000 to Lilian doing business as Marsan Realty Company and that as of January 1, 1954, this sum was carried on Marsan's books as a loan payable to David. Lilian had paid for an insurance policy covering the building transferred, and as of July 1, 1954, several years remained of the coverage, the value of the prepaid premium being $758.33. Lilian transferred the policy to Marsan Realty Corp. and reduced her indebtedness to David by the amount of $750. David was given a credit for the capital contribution on the books of Marsan Realty Corp. of $750 and the amount was charged against the prepaid insurance asset on the corporate books. In our view this transaction was the equivalent of David's paying $750 cash to Marsan Realty Corp. on July 1, 1954, and Marsan Realty Corp. using the $750 so paid to purchase insurance on its building. Cash constitutes property for the purposes of section 351. American Bantam Car Co., 11 T.C. 397 (1948), *94 affirmed per curiam 177 F. 2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950). However, if the view were taken that David accepted the prepaid insurance from Lilian in repayment $750for of her indebtedness to him and then contributed the prepaid insurance to Marsan Realty Corp., the result is the same. The prepaid insurance would be property which would thus be considered to have been contributed by David and which had a value slightly in excess of the $750, the amount of contribution with which David was credited on Marsan Realty Corp's books. Markley paid cash for his stock. Although Markley did not pay for the stock until some 8 months after Marsan Realty Corp. was created, it is clear that he was in the transaction from the start, was obligated to Marsan Realty Corp. in this amount, and his delayed payment was due to mere procrastination. [7]
*95 Since the transfer of the Easton Avenue property to Marsan Realty Corp. was in effect a transfer of property for stock or securities and not a sale, and since the nonrecognition of gain provisions of section 351 apply to this transaction, it is unnecessary to discuss the alternative grounds presented by the parties. It also logically follows that the interest deductions claimed by Marsan Realty Corp. must be disallowed and that the corporation's basis in the building for depreciation purposes is the same basis Lilian had in the property before the transfer. It is likewise clear that any assessment of a deficiency against Lilian and David for the year 1954 is barred by the statute of limitations. The remaining issue is the proper tax treatment for the amounts of $614.80 and $2,718.80 in the years 1956 and 1957, respectively, paid by Marsan Realty Corp. as insurance premiums on insurance policies owned by Lilian. Respondent raised this issue by amended answer and, therefore, has the burden of proof. Petitioners contend these payments were advances made by Marsan Realty Corp. to Lilian to be later offset by crediting principal payments due on the mortgage against these advances *96 as the principal payments under the mortgage became due. Respondent contends that the insurance payments themselves constituted payments on the mortgage and are to be treated as dividends to Lilian because the mortgage represents an equity interest in her. The trouble with both petitioners' and respondent's position is that after July 1, 1956, Lilian was not the owner of the mortgage in her individual capacity, she having transferred it to the trust, and the two insurance premium payments on Lilian's behalf were made after that date. Therefore, we are left with insurance premium payments on Lilian's behalf which are denominated as advances to Lilian but, as far as Lilian is concerned, the record is clear that she never intended to make repayment. Even petitioners' witnesses testified the repayment was to be made only by way of offset against principal amounts due under the mortgage. Therefore, what is denominated as an advance must be treated as an outright payment on Lilian's behalf by Marsan Realty Corp. The mere fact that because of family relationships, no objection might be raised if Marsan Realty Corp. offset a liability owing to the trust by the amount of payments made on *97 Lilian's behalf does not vitiate the fact that as far as Lilian is concerned the payments are outright. The insurance premium payments were not to be repaid as far as Lilian is concerned. They, therefore, represent ordinary income to David and Lilian, filing jointly, in the nature of dividends, the same as do the payments denominated as interest. The record is clear that Marson Realty Corp.'s earnings and profits were in excess of the amounts of those payments on Lilian's behalf in the years the payments were made. Decision will be entered under Rule 50. Footnotes
1. Secs. 6501(a) and 6501(e)(1)(a), I.R.C. 1954↩. All Code references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.
2. Petitioners in their brief do not specifically argue the point of whether gain is recognizable if the transaction is considered an exchange of property for stock or securities but do contend that since respondent has the burden of establishing an omission in excess of 25 percent of gross income in 1954 by Lilian and David in order to assess a deficiency within the time provided under section 6501(e)(1)(a), it is incumbent on respondent to prove that any gain on the sale in 1954 is properly includable in the income of Lilian and David for that year. Petitioners filed no reply to respondent's brief but notified the Court that they did not deem a reply necessary.↩
3. Much of the testimony at the trial was by expert witnesses with respect to the fair market value of the property located at 222 Easton Avenue. Petitioner's experts placed a value on this property as of July 1, 1954, of approximately $38,000, and it is this amount which petitioners contend was the fair market value of the property as of that date. Respondent's expert stated his opinion to be that the fair market value of the property as of July 1, 1954, was $45,000. All of the experts base their opinion in part on the fair rental value of the property. However, petitioners' experts failed to consider as rental space in their evaluation, one-half of the second floor of the building which was occupied by offices of New Jersey Dairy Laboratories, Inc. Since under our decision in this case the fair market value of the property is important only in showing that the stated sales price of $75,000 was grossly in excess of the property's fair market value at the date of the transfer of the property to Marsan Realty Corp., we consider it unnecessary to discuss the various factors considered in arriving at our evaluation or to include in the findings set forth the detailed information on which the determination is based, much of which consists of uncontroverted facts.↩
5. It might be noted that the record shows a going interest rate on mortgages as of July 1, 1954, of about 5 percent or slightly more whereas the rate set here was 4 percent.↩
6. Respondent makes no contention that each transferor must receive some voting stock in order for the gain not to be recognized under section 351. In Cyrus S. Eaton, 37 B.T.A. 715 (1938), where one transferor received only common stock and the other transferors only preferred stock, we stated: "Inasmuch as the transferors owned all of the stock of the corporation they have the necessary control required by statute." After this statement a discussion followed of the substantially proportionate test applicable under the provisions of section 112(b)(5) of the Internal Revenue Code of 1939 but not under section 351. The Report of the Ways and Means Committee of the House of Representatives, 83rd Congress, 2d Session (H. Rept. No. 1337 to accompany H.R. 8300, (Pub. L. 591), p. A116-A117 (1954)), explains the elimination of this requirement as follows: The basic change from present law made by your committee in section 351 is the elimination of the so-called "proportionate interest" test. This requirement, which appears in section 112(b)(5) of the 1939 Code, permits nonrecognition of gain and loss only if the stock and securities received by each transferor are "substantially in proportion" to the interest of such transferor in the property prior to the exchange. This requirement, which, if unsatisfied, serves to vitiate the tax-free nature of the entire transaction, caused considerable uncertainty in its application. In eliminating the proportionate interest test, your committee intends that no gain or loss will be recognized to a transferor transferring property to a corporation under section 351, irrespective of any disproportion of the amount of stock or securities received by him as a result of the transfer. Thus, if M and N each owning property having a value of $100 transfers such property to a newly formed corporation X, and M receives all of the stock, such transaction would not be subject to tax under section 351. To the extent, however, that the existing disproportion between the value of the property transferred and the amount of stock or securities received by each of the transferors results in an event taxable under other provisions of this code, your committee intends that such distribution will be taxed in accordance with its true nature. For example, if individuals A and B, father and son, organize a corporation with 100 shares of common stock and A transfers property worth $80 in exchange for 20 shares of stock, while B transfers property $20worth to the corporation in exchange for 80 shares of stock, no gain or loss will be recognized under section 351. The clear indication here is that it is not necessary that all transferors even receive stock if some transferors are in control after the transfer.↩
7. See the provisions of sec. 1.351-1, Income Tax Regs., that: * * * The phrase "immediately after the exchange" does not necessarily require simultaneous exchanges by two or more persons, but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure. * * *↩