In re ESTATE of Herbert B. MILLER, Deceased, United States National Bank of Portland (Oregon), Administrator, d.b.n., c.t.a., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15031.

United States Court of Appeals Ninth Circuit.

Dec. 27, 1956.

McCarty, Swindells, Miller & McLaughlin, David S. Pattullo, William Miller, Portland, Or., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Hilbert P. Zarky, Grant W. Wiprud, Earl E. Pollock, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before POPE, CHAMBERS and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

The Tax Court upheld the Commissioner's determination of a deficiency in petitioner's income taxes for the calendar years 1946–1947. Prior to 1946, Miller Paint Co., was a partnership, composed of three brothers, who, as sole owners of the partnership business, had inherited it from their father. The partnership operated a store business selling paint and related products at retail and wholesale and did some manufacturing of paint. The partnership's only property was personal property. It carried on its business on premises leased from another partnership composed of the same members.

In May, 1946, pursuant to a pre-arranged plan, the members of the partnership organized a corporation, and transferred to it the operating assets of the

partnership with some cash, and took in equal parts, the shares and notes of the corporation. Payments were made on these notes in the years in question; such payments being made out of income received and earned by the corporation. Petitioner's decedent treated the payments received as a return of principal. The Commissioner's finding of a deficiency is based upon his challenge of this treatment. His position was that the notes issued by the corporation to the taxpayer and his brothers did not represent bona fide indebtedness, and that the payments which were purportedly made on the notes, constituted in fact distribution of taxable dividends. The Tax Court sustained this position of the Commissioner.

The facts upon which the Tax Court's decision was based are stated in its opinion, 24 T.C. 923. In main outline they disclose that while the business was conducted by a partnership, it had grown and prospered and continued to earn substantial profits. In 1943, two of the partners learned that the third, Herbert Miller, the decedent, was suffering from cancer, and that he had but a limited time to live. Herbert knew he was seriously ill. The brothers proceeded to endeavor to work out a plan whereby the business could continue without interruption in the event of the death of one of the partners. They rejected the suggestion for the creation of a trust to carry on the business and decided to form a corporation and to transfer to that corporation the assets necessary to carry on the business.

Herbert was the only brother who had a child. Another brother, Ernest, wanted to be able to leave his share of the business in the event of his death to some of the old employees. Having these circumstances in mind, all three of the partners consulted an attorney and sought his assistance in working out an arrangement that would accomplish these objectives. During the same time the same attorney prepared Herbert Miller's will. Herbert wanted to get some of his assets out of the company so that he could dispose of them by a testamentary trust or testamentary disposition to his widow in case of his death. The attorney was also informed of Ernest's desire to get a portion of his assets out of the company as he wanted to leave the paint business proper to some of the old employees upon his death. There was some discussion of leaving the business in the partnership and taking out insurance policies for the widow of the decedent but it was finally concluded to organize a corporation and so the parties proceeded as follows: they organized an Oregon corporation under the name of Miller Paint Co., Inc., with authorized capital of 300 shares of no par stock, and contributed as initial capital investment, the sum of $1050 ($1000 was the minimum amount required by Oregon law). Each brother took 100 shares of stock at a stated value of $3.50 per share, and paid his one-third of the $1050 from his own funds. The corporation then borrowed $50,000 from the three brothers and executed a three year promissory note therefor bearing interest at 5 per cent per annum. The corporation then purchased from the brothers at inventory value substantially all of the tangible assets of the firm.[1] The fair market value of those assets was $86,622.49, and a corporation note for such amount was issued payable in annual installments of no less than $20,000, and bearing interest at 5 per cent per annum. The corporation then purchased certain petty cash and intangible assets from the partnership and assumed the firm's accounts payable. The net fair market value of what the corporation thus acquired was $37,948.-

---

1. The findings list these items as follows:
"Fair Market Value on June 1, 1946—

| "Item | |
|---|---|
| "Inventory | $60,122.49 |
| "Machinery and Equipment | 15,000.00 |
| "Furniture and Fixtures | 3,000.00 |
| "Delivery Equipment | 7,500.00 |
| "Office Equipment | 1,000.00 |
| "Total | $86,622.49" |

77,[2] and a note in that amount was given to the partners. This note also bore interest at five per cent per annum. It was payable six years from date. The corporation gave a chattel mortgage upon its personal property as security for the last two notes mentioned. Some 60 days later these three notes were cancelled and in lieu thereof new notes were issued to each partner separately. The aggregate amount of the notes was $174,571.-26.[3]

It is also necessary to a full understanding of what the parties here contemplated to note the history of the Miller Paint Co. and the character of the business which passed to the corporation at the time when these arrangements were completed in May and June, 1946. The three brothers had been operating the business for some 25 years. When it passed to them from their father it was a small undertaking and confined to retail merchandising but as the years went on the business was successful and the company branched out into the wholesale and manufacturing ends of the paint business. The existing business was sufficiently well established that the interested parties could justly contemplate that the notes issued would be paid off out of earnings of the business in a relatively short period.[4] These expectations proved well founded and so, in 1946 and 1947, the earnings of the business were such that the corporation paid to each of the partners upon their $28,874.16 notes, not merely the $6666.66 called for, but the sum of $7500 was paid upon principal in 1946, and $10,000 was paid upon principal in 1947.

The general favorable earning capacity of the corporation and its business is indicated by the fact that in the estate of Herbert Miller his 100 shares of the capital stock of Miller Paint Co., Inc., was valued for estate tax purposes at $347.78 per share; this as of February 13, 1948, approximately a year and one-half after the transfers to the corporation. This value was based upon the average earnings of the partnership and the corporation projected over a period of ten years, with an allowance for management, and capitalized at the rate of 20 per cent. This indicates an enterprise with substantial good will; and since the record shows no reason for inferring a marked change in the business between the date of the transfers to the corporation, and the date of Herbert's death, it may fairly be assumed that from the initiation of the corporation, the corporate stock reflected values based upon probable earning capacity of approximately 300 times $347 per share, or somewhere in the neighborhood of $100,000.[5]

It will thus appear that the arrange-

---

2. These items are listed in the findings as follows:

| "Item | Amount |
|---|---|
| "Petty cash and change fund | $ 598.00 |
| "Accounts Receivable | 89328.54 |
| "Unexpired Insurance | 636.40 |
| Total | $90562.94 |
| "Less: Accounts Payable | 52614.17 |
| "Balance | $37,948.77" |

3. In the place of the cancelled notes for $50,000 and $37,948.70, a note for $29,-316.26 was issued to each partner, payable 6 years from date. In lieu of the cancelled note for $86,622.49, each partner received a note for $28,874.16 payable in annual installments of not less then $6666.66. All notes bore interest at 5 per cent per annum and the previ-

ously executed chattel mortgages were made to stand as security for the payment of the new notes.

4. From the Tax Court's opinion: "To be sure, the partners undoubtedly expected, as contended by petitioner, earnings to be sufficiently high that in a relatively short time they would be able to withdraw sums approximating in amount their original capital investment without impairing necessary capital; and subsequent events seem to prove this expectation to have been justified."

5. The value of the stock in February, 1948, would be some evidence of its value in May or June, 1946, in view of the apparent continuity of the business involved and the absence of anything to show reason for change in the interim. See Wigmore on Evidence, 3d ed., §§ 437, 463.

ments made by the parties, and here described, were calculated to accomplish two objectives. The first objective was to set up the business in such form that its continuity would not be affected by Herbert's impending death and his son, for whose welfare all brothers manifested great solicitude, could step into his shoes and go forward with a continuing business. The second objective was to separate from the enterprise and place into the hands of the individual partners, the substantial amounts of cash which the partnership had accumulated and had on hand, and also make available to them individually, the proceeds of the notes which were issued and which it was anticipated would be paid when due and as provided in the notes. So far as Herbert was concerned, the notes would constitute a portion of an estate created for the benefit of his family in the event of his death.[6]

As before indicated, the controversy here arose out of the insistence of the Commissioner that the notes issued to Herbert Miller did not create a bona fide debtor-creditor relationship, and the payments to him in the years 1946–1947 of $7500 and $10,000 respectively, upon the principal of one of said notes, represented dividend distributions to that extent. The Tax Court's determination, supporting the Commissioner, was based upon three grounds. The first was that there was no intent that the notes would ever be paid; the second was based upon the alleged thin capitalization of the corporation; and the third reason was that the whole arrangement was lacking in "business purpose". We find ourselves unable to agree with the reasons given by the Tax Court for its determination.

With respect to the first point made by the Tax Court, it said: "Although the

notes in form are absolute, and call for fixed payments, we have no doubt, from a reading of the entire record, that no payment was ever intended or would ever be made or demanded which would in any way weaken or undermine the business." A careful reading of the record discloses to us no basis for that conclusion. There is nothing ambiguous about the terms of the instruments or the obligations set forth in the notes themselves. As the Tax Court itself noted, "this is not a case involving 'hybrid securities', a term generally used to describe corporate instruments bearing indicia both of evidence of indebtedness and of capital investment". It is true that it was contemplated that the notes would be paid out of the earnings of the corporation, but the most excellent record of the past earnings of this same business was such that this was a reasonable contemplation. Many borrowers rely upon expected earnings for payment of their debts. We cannot see any justification for inferring that a promissory note is unreal and not representative of the actual arrangement merely because the maker expects to pay out of future earnings.

But what the Tax Court and the Commissioner have overlooked is the fact that not only the lawyer who arranged the transfer to the corporation and the execution of the notes, and drafted the will of Herbert Miller, but the other Miller brothers as well knew that Herbert's will provided for the creation of a trust to hold both the shares of stock in the corporation and the notes here in question and the proceeds of the notes were to be reinvested by the trustee, the petitioner bank, for the benefit of Herbert's widow. It was known that Herbert had but a short time to live, and that the trustee would hold the notes and as a trustee be

6. These dual objectives are stated in the findings of the Tax Court in the following language: "Decedent was the only partner with children. Ernest was married but had no children, while Walter was unmarried. The three brothers desired an arrangement whereby death or incapacity of a partner would not affect the continuity of the business, the business could carry on free of interference in case of possible complications in the eventual probate of an estate, and an estate could be created for the benefit of a decedent's family in case of his death. In addition, Ernest wished to leave his share of the business to some employees without disturbing management and control."

obligated to enforce them. We think that this situation positively negatives any inference of an intent that the notes would not be paid.[7]

The Tax Court placed much emphasis upon what it called "an absurdly low capitalization" of the corporation. While the court expressly disclaimed any intent to decide whether inadequate capitalization in and of itself would authorize the court to disregard as genuine the purported indebtedness,[8] it did discuss at length cases dealing with the so called "thin capitalization" question.[9]

The findings of the Tax Court referred to the declared value of $1050 set upon the organization of the Oregon corporation. The findings, however, fail to note that the best available evidence upon the subject, namely, that furnished by the estate tax appraisal previously referred to, indicates that the declared value had no relation whatever to the real values of the corporation stock. When those facts are taken into consideration, it seems apparent that there was no disproportionate ratio of debt and capital in this case. If the capital stock was worth $100,000, or thereabouts, as has been indicated, an indebtedness of $174,000 would not be disproportionate, and no such ratio has ever been held to create a fatally thin capitalization. As stated by the Court of Appeals for the Second Circuit in Kraft Foods Co. v. Commissioner, 232 F.2d 118, 127: "We think it obvious that in the determination of debt-equity ratios, real values rather than artificial par and book values should be applied." [10]

7. The facts here are to be contrasted with those in Gooding Amusement Co. v. Commissioner, 6 Cir., 236 F.2d 159, where a divided court approved a finding that the holders of the notes issued to the stockholders did not intend that the note should be collected and that the notes were a sham. In that case, although notes aggregating over $200,000 had been issued, only some $5000 had been paid on the notes which had been issued in series, and most of the notes were long past due. There the circumstance that the notes were not in fact paid could conceivably give rise to an inference that they were not intended to be paid. That situation contrasts with the one here where the amounts actually paid were in excess of the amounts due and owing.

8. Said the Tax Court: "We do not have to decide here whether inadequate capitalization standing alone justifies the treatment of amounts alleged to represent indebtedness as invested capital."

9. For a recent discussion of this problem which alludes to this case in the Tax Court, see "Thin Capitalization: Some Current Questions" by Boris I. Bittker, 34 Taxes, 830 (Dec. 1956).

10. The quoted language is in line with other decisions of the Tax Court. Thus in Sheldon Tauber, 24 T.C. 179, four partners transferred their business to a corporation. The corporation issued to each of them "25 shares of its capital stock for $1.00 per share". This added up to a total of $100. They also took

notes of the corporation for sums aggregating $209,000. The Tax Court said: at pages 181–182, "Existing business conditions and prospects for future business conditions for the partnership were excellent at the time of the transfer. The partnership at that time had orders for over $500,000 worth of business. The fair market value of the assets and business transferred to the corporation at the time of the transfer was at least $150,000 in excess of the total asset values then shown on the books of the partnership and of the corporation. * * *

* * * * *

"The evidence shows that that excess was a substantial amount, probably in excess of $150,000. Thus, the initial capital of the corporation was not merely the $100 of cash paid in by the four individuals and shown as capital on the books of the corporation, but was a much larger amount not shown on its books which was nevertheless available as working capital. The total capital of the new corporation could not fairly be called 'thin'." at pages 183–184. cf. Ainslie Perrault, 25 T.C. 439: "But we think the respondent has overlooked the fact that in addition to the assets which the Corporation purchased for a total consideration of $1,026,951.32 it also acquired from the partnership for no consideration orders or unbilled items and goodwill having a substantial value to the Corporation of, to-wit, several hundred thousand dollars. The petitioners point to the fact that the Corporation realized from the rental contracts which

In holding that a business purpose was wanting here, the Tax Court said: "The record in the instant proceeding satisfies us that there was no valid business purpose which dictated the gross undercapitalization here present. There seems to be no question that sound reasons existed for forming a corporation to carry on the business, which had been operating up to that time as a copartnership, but every advantage sought through incorporation, except that of the avoidance of taxes, could have been accomplished with equal facility and assurance of success by the more normal method of the issuance of capital stock of the par or declared value more nearly commensurate with the total amount permanently contributed to the corporation, and with which it was expected thereafter to conduct its affairs." We know of no rule which permits the Commissioner to dictate what portion of a corporation's operations shall be provided for by equity financing rather than by debt. It is common knowledge that the choice of procedures in this regard will vary from corporation to corporation and we think that it cannot be said that any particular method of issuance of stock and incurrence of indebtedness can be labeled as "normal", and hence subject to approval by the Commissioner.

[2, 3] Of course, transactions no matter in what form, may be disregarded if they are a sham or masquerade. In this connection it is of importance to inquire whether the arrangements adopted have no purpose germane to the conduct of the business of the parties other than tax minimization. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. It cannot be said that the parties had no intent to create a genuine indebtedness since the written instruments objectively manifest their intent to do just that. There is no evidence that this precise arrangement would not have been made and found desirable by the parties even though no tax consequences were involved. As the facts disclose, all the brothers were alike interested in arranging for perpetuation of the business for the benefit of Herbert's son and to take care of the old employees for whom Ernest wished to provide. For this reason they wanted a corporation and they set it up. At the same time they wanted to provide a means whereby Herbert's wife would take an easily liquidated estate with income definitely available to her. Had Herbert's interest been represented solely by stock in the corporation his wife, after his death, would have been dependent upon the declaration of dividends and over this, she, as a one-third owner, would have no control. She would have no protection against the draining off of a substantial portion of the income of the corporation, through salaries to corporate officers. These are matters which the brothers had a right to take into consideration when they decided how they would extend financing to the corporation. All of these were non-tax objectives, and we think that the evidence here shows an adequate and sufficient business purpose to demonstrate conclusively that the arrangement was no sham.

We hold, therefore, that the assessment of a deficiency was erroneous, and the decision of the Tax Court is reversed.

---

were transferred to it on organization a total of $928,248.73. They also argue that goodwill of over $600,000 passed from the Partnership to the Corporation. We have not thought it necessary to determine the value of each separate asset that passed to the Corporation, but we have no hesitation in determining that they were of large value amounting to several hundred thousand dollars and constituted such an ample investment in the Corporation as to preclude any justification for holding under the thin capitalization doctrine that the transferred assets under the purchase agreement of January 5, 1948, should in substance be considered capital rather than a bona fide sale by the stockholders to the Corporation."