**A. R. LANTZ CO., Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 66–814.**

United States District Court
C. D. California.

April 10, 1968.

Eugene J. Brenner, Janin, Morgan & Brenner, San Francisco, Cal., for plaintiff.

Wm. Matthew Byrne, Jr., U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief of Tax Division, Jerry R. Stern, Asst. U. S. Atty., Los Angeles, Cal., for the Government.

## MEMORANDUM OF DECISION and FINDINGS

BYRNE, District Judge.

This is an action for refund of corporate income taxes and interest. Jurisdiction is based on 26 U.S.C. § 7422 and 28 U.S.C. § 1346.

The dispute arises from tax returns filed for the fiscal years ending in February of 1963 and 1964. In each return the plaintiff claimed deductions for interest paid to A. R. Lantz and Gus D. Vellis, the stockholders of the taxpayer. The returns were audited by the Internal Revenue Service and additional taxes were assessed by reason of the disallowance of the deductions. The plaintiff

paid the additional assessments plus interest and filed a claim for refund. No action was taken on the refund claim within six months and this lawsuit followed.

The plaintiff was incorporated on June 1, 1955. Its predecessor was an equal partnership of Lantz and Vellis doing business under the name of A. R. Lantz Co. During the two months prior to incorporation, David Cornman advanced $51,000 to the partnership. It was understood by all concerned that this sum represented the value of a one-third interest in the partnership and was made in anticipation of the incorporation. The three individuals agreed that upon incorporation of the plaintiff, each would receive $15,000 of common stock as partial consideration for his interest in or claim against the partnership and that the balance of this interest or claim would be a loan to the plaintiff.

On May 31, 1955, the three individuals had the following interests in or claims against the partnership:

|  | Lantz | Vellis | Cornman |
|---|---|---|---|
| Equity | $46,768.08 | $46,768.08 | |
| Debt | | 10,005.00 | $51,000.00 |

At the time of incorporation the principal assets of the partnership were approximately $120,000.00 of accounts receivable and approximately $60,000.00 of inventory. The principal liabilities were $45,-000.00 of notes payable and the loan payable to Cornman. On June 1, 1955, all the partnership assets and liabilities were transferred to the plaintiff. The journal entry reflecting the transfer shows $45,000. in capital stock subscribed plus the following amounts due to the three shareholders:

| Cornman | $36,000.00 |
|---|---|
| Vellis | 41,773.08 |
| Lantz | 31,768.08 |

On June 1, 1955, the books and records reflect that various notes were issued by the plaintiff to its shareholders in the following amounts:

| Lantz | 1. | $46,768.08 |
|---|---|---|
| | 2. | 31,768.08 |
| Vellis | 3. | 46,768.08 |
| | 4. | 10,005.00 |
| | 5. | 41,773.08 |
| Cornman | 6. | 51,000.00 |
| | 7. | 36,000.00 |

———◆———

Notes 1, 3, and 6 bore interest at the rate of 7% per annum and were due on June 1, 1960. At the same time the books and records reflect that each shareholder subscribed to $15,000 worth of stock. It is apparent that note 1 less the subscription equals 2; notes 3 & 4 less the subscription equal 5; and 6 less the subscription equals 7. There is, however, some confusion as to when the various notes were delivered to the individuals and what, if any, cancellation procedures were taken with some of the notes. In addition there seems to have been a substantial delay between the subscription for the stock and its actual delivery.

Various small loans were made to plaintiff by each of the shareholders during the first years of operation. On January 30, 1957, stock was finally issued to Lantz, Vellis, and Cornman.

Notes 1, 3, and 6 above were cancelled and new notes in the amounts of $31,768.-08 for Lantz and Vellis and $36,000.00 for Cornman were issued. Note 4 to Vellis had previously been paid off by the plaintiff. It is not clear what became of notes 2, 5, and 7 or whether in fact they were ever issued. In any event, by July 31, 1957, each shareholder owned $15,000 worth of stock and was owed $36,000 by the corporation.

None of the notes contained an acceleration clause. Some interest payments were made to the noteholders, though not always at the stipulated rate or time. No payments of principal were made on the notes after equalization was achieved.

On September 15, 1958, Lantz and Vellis agreed to buy out Cornman. The books reflect that the corporation purchased the stock by obtaining loans from a bank and from Lantz and Vellis. Cornman's stock certificate was never cancelled. The plaintiff's records show that on October 1, 1959, new $60,000 notes were issued to Lantz and Vellis to cover the new full amount of their loans to the plaintiff. According to the books these notes were not issued until May of 1960. There was never any sinking fund for the retirement of the notes or any collateral security.

The corporation never paid any dividends. The noteholders were the shareholders and the officers of the plaintiff. The noteholders individually guaranteed the indebtedness of the plaintiff to the Bank of America and subordinated their loans to any bank lending.

The quest to find a clear test to determine whether a particular advance is a loan or a capital investment is not an easy one. The massive briefs filed by the parties to this action contain innumerable citations. From each case cited various factors favoring the selector are extracted and compared with factors allegedly present in our case. The trial of the case followed the same lines with each side stressing individual characteristics of the transactions. The most cited case in all the Ninth Circuit opinions on this subject is Wilshire & Western Sandwiches, Inc. v. Commissioner of Internal Revenue, 175 F.2d 718 (9th Cir. 1949). That case, as this one, dealt with an attempt to deduct certain interest payments made on notes given to shareholders in return for advances. In that case the shareholders advanced some $55,000 to the corporation prior to its commencing business. No receipts were provided for this money. Sometime later the parties decided that $30,000 should be allocated to stock and the remaining $25,000 should be loans. Notes were issued but no interest was paid. Originally the advances were not carried on the books as loans. However, this was subsequently corrected. The shareholders expected to be repaid but indicated that they would try not to injure the corporation by any such repayment.

The Ninth Circuit held for the taxpayer. The court stated that the obligation was unconditional and legally enforceable. Further reliance was placed on the fact that the shareholders had non-tax motives in reaching their decision to allocate their advances in the above described manner. Primary reliance was placed on the intent of the taxpayers in making the advances. The intent which the Court discussed is the intent to either make an investment and take the risks of the venture, or to seek a definite obligation which is payable in any event. This "intent" test has been cited and followed in Utility Trailer Mfg. Co. v. United States, 212 F.Supp. 773 (S.D.Cal.1962); Earle v. W. J. Jones & Son, Inc., 200 F.2d 846 (9th Cir. 1952); and Los Angeles Shipbuilding & Drydock Corp. v. United States, 289 F.2d 222 (9th Cir. 1961).

Perhaps the next significant case in this area is Miller's Estate v. Commissioner of Internal Revenue, 239 F.2d 729 (9th Cir. 1956). In that case three brothers who operated a partnership learned that one had contracted terminal cancer. They went to their attorney to seek a plan whereby the business could be continued without interruption in the event of the death of one of the partners.

They also desired to be able to take some of the money from the business so that it might be distributed through estate plans. After considering a trust arrangement, the decision was reached to incorporate the partnership. The assets were transferred to the corporation in exchange for a small amount of stock and a substantial amount of notes.

The Ninth Circuit held that the payments received on the notes were a repayment of loans rather than disguised dividends. The Court stated that as long as the terms of the obligations were absolute, it was permissible to pay interest and principal out of earnings. The Court also noted the *Wilshire* test and commented that the circumstances indicated that repayment must have been intended. The key to the Court's decision, however, rested on the legitimate business purpose test first enunciated in the case of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). The Court found that the creation of the loans in this case was not a sham transaction. The clear objectives of the parties to continue the business and to simplify estate planning problems showed that there were definite non-tax motivations for designing the business entity along the chosen lines.

The next important Ninth Circuit case is O. H. Kruse Grain & Milling v. Commissioner of Internal Revenue, 279 F.2d 123 (9th Cir. 1960). In that case the Court affirmed a Tax Court decision holding that interest paid by a corporation on a note held by the sole shareholder of the corporation was not deductible. In reaching its decision, the Court attempted to bring together in one place all the various factors which have been considered at any time as relevant to the debt-equity dilemma. The Court determined that there were eleven basic factors to be considered:

(1) The name given to the advance; (2) the presence or absence of a fixed maturity date; (3) the existence and source of principal payments on the notes; (4) the right of the noteholder to enforce payment; (5) the degree of participation by the noteholder in management; (6) presence or absence of subordination of the debt to other debts; (7) the intent of the parties; (8) thin capitalization; (9) the payment of interest from money which might otherwise be available for dividends; (10) the identity and percentage of interest in the corporation between shareholders and noteholders; (11) the ability of the corporation to obtain outside lending.

The basic approach suggested by this case seems to be to evaluate each of the above factors and then somehow weigh them in arriving at a decision. How the weighing process is to be handled is not clear. Variations of this process seem to have been applied in the cases of Taft v. Commissioner of Internal Revenue, 314 F.2d 620 (9th Cir. 1963) and Utility Trailer Mfg. Co. v. United States, supra.

A final approach to the problem is that suggested in the recent case of Lundgren v. Commissioner of Internal Revenue, 376 F.2d 623 (9th Cir. 1967). In that case the Court said at page 626:

"There are no rules of thumb by which to determine a debt versus equity question, and it is not necessary here to catalogue the many considerations relevant to that determination. The answer depends on the particular circumstances of each case, and our determination here is based on the following circumstances present in this case."

The Court then went on to list seven factors which it considered as demonstrating that debt rather than equity was involved in the case before it. The net result of such an approach is not very much different from that presented by the *Kruse* case, supra. Although more factors were noted in *Kruse,* it is reasonable to assume that under the reasoning of that case the Court can only be expected to evaluate and weigh the factors which are in fact present in the particular case.

In the instant case there seems to be no dispute that so far as basic formalities were concerned the noteholders generally designated their advances as loans. They

were listed as such in the books of the taxpayer and the individuals referred to them as such in individual financial documents. Eventually the advances were represented by notes which were held by the noteholders. There is a conflict of testimony over when the notes were issued. However, it is clear that there were notes in existence during the taxable years in question.

Admittedly there was initially a fixed maturity date for the obligations. However, testimony at the trial indicated that the parties were not fully conscious of these dates and probably would not make a demand on those dates unless it was convenient for the corporation. In addition, what actual payments were made on the principal were made without regard to the maturity date, and payment of the major part of the obligations was postponed beyond the maturity date.

The taxpayer recognizing this problem, notes that new business developments caused the postponements and that in any event this factor has been held not to be controlling in *Taft,* supra and *Los Angeles Shipbuilding,* supra.

The payment record of the principal on these obligations is very poor. Initially some amounts were repaid, but it seems clear that the Government is correct in asserting that these payments were only made to equalize the positions of the three individuals vis-a-vis the corporation. Once the "loans" were equal, no further repayments were made with the exception of the transaction which terminated Cornman's interest in the business. The taxpayer relies on the *Wilshire* case, supra, for the proposition that the same strict insistence on payment that a bank might require does not apply to shareholders lending funds to their own corporation. However, as the Government points out, the failure in our case is much more substantial than was present in the *Wilshire* case.

As a technical matter, the individuals did have the right to demand payment. The parties testified that they expected to be repaid and Mr. Lantz testified that he had informed his wife of the right to get at the money.

The Government takes the position that the parties realistically would not enforce payment if it would injure the corporation in any possible way. Further, the Government points to the lack of an acceleration clause, a sinking fund, or collateral as indications that enforcement of payments was unlikely and of little concern to the individuals.

In our case the noteholders, shareholders, and managers of the taxpayer were the same individuals. The Government relies on *Kruse,* supra, as well as Brake & Electric Sales Corp. v. United States, 287 F.2d 426 (1st Cir. 1961) for the proposition that this fact is relevant to a debt-equity situation.

The only answer provided by the taxpayer is the observation that this participation was present in all of the Ninth Circuit cases which favored the taxpayer and, thus, it cannot be too important.

It is stipulated that the obligations of the shareholders were subordinated to those of the Bank of America by October of 1956. The Government contended that subordination existed earlier but was unable to establish this at trial. It would seem that the taxpayer is correct that the dates do not make that much difference. The issue is whether the shareholders intended that their loans would have an inferior status. Since subordination took place shortly after incorporation, and long before the tax years in question, it would seem that this is much the same as subordination from the outset.

The position of the taxpayer is that this Court should take judicial notice of the fact that subordination is often a requirement of bank lending and that this corporation was never in danger of not being able to meet its obligations. In addition, reliance is placed on *Lundgren,* supra, and John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946), both

of which held for the taxpayer in cases where subordination was present.

It is conceded by both sides that the importance of the factor of thin capitalization has diminished under recent decisions. Particularly is this true since the case of *Miller's Estate,* supra, which found valid loans in a situation where the ratio of debt to equity was enormous. The Government, however, insists that this should be an important factor in our case since the debt-equity ratio was infinite. This argument is based upon the delay in issuing stock in the taxpayer. While the stock was not issued, the entire sum advanced was treated as debt. The taxpayer contends that the approximately one and one-half year delay was due in part to the California Corporation laws and in part to the inexperience and procrastination of counsel and was certainly not intentional.

It is agreed that during the relevant period of time no dividends were paid by the taxpayer to its shareholders. It is apparent from the testimony that the taxayer's business was a profitable venture during the same period. The Government argues that interest was paid on advancements as a substitute for dividends. The taxpayer urges that there could be any number of reasons why dividends were not paid. In addition the taxpayer relies on *Wilshire,* supra, *Earle,* supra, and *Lundgren,* supra, for the proposition that failure to pay dividends is not fatal. However, the Government does seem to be correct in its assertion that in those cases it was not possible to pay dividends, where here it appears that funds would have been available for that purpose.

The same persons who owned the stock in the taxpayer also "loaned" money to it. The amounts loaned to the corporation by the original shareholders became equal after about two years of operation. Subsequent to that time the small lending which had been frequently pursued at the outset ceased. The Government takes the position that the amounts loaned were similar at the beginning and that it was intended from the start that all loans from shareholders would be equal in amount. The taxpayer points to the fact that the loans were not equal for two years and to Lantz's testimony that he equalized his loans as a matter of personal pride. Probably the strongest argument in support of the Government's position is the fact that once the loans were equal there was not variation thereafter.

There was some time spent at the trial over the question of obtaining outside financing. However, nothing conclusive was reached by means of the testimony. Mr. Lantz testified that accounts receivable could have been factored but did not testify as to how much money could be raised, how long the money would be available, or how much interest would have to be paid. There was some testimony that lending could have been obtained from Bank of America, but little detail was developed. Finally Mr. Lantz said that two of his brothers would have loaned money but again the amount and terms are undisclosed.

Conceivably there are two situations where the outside financing might be relevant. In the first, if cheaper financing is available one might conclude that reasonable businessmen would use that source rather than borrowing from themselves. In the second, if no other lending could be had, one might conclude that no reasonable businessman would loan money to the corporation and thus, that what was done was more in the nature of an investment. The testimony, however, did not clarify either of these positions so that useful evaluation is difficult.

The taxpayer takes great pride in pointing out that the shareholders testified that in deciding how much to invest and how much to loan, no consideration was given to tax matters. Such testimony is, of course, difficult to refute. The problem for decisional purposes, moreover, is that nowhere did the plaintiff ever explain why the transaction was tailored in the chosen fashion. The *Mil-*

*ler's Estate* case, supra, relied on by the taxpayer, gave weight to the ability of a taxpayer to show non-tax motives for arranging its debt-equity structure in a particular manner. Here, though the parties testified that tax considerations did not motivate them, they did not say what considerations did. In addition, no testimony was clearly presented which would show what the advantages from a tax standpoint were to the corporation or to the individuals. The net result of these gaps is to make most difficult a determination as to the reasons for this whole transaction.

The factors discussed above are taken from *Kruse*, and the *Miller's Estate* case. Perhaps the key factor is that of "intent". The only way the cases in the circuit can be reconciled to retain consistency is to interpret "intent" in the broadest sense. The plaintiff has attempted to narrow the meaning down by asserting that the agreement by the shareholders that so much of their advances should be stock and so much loans, is a clear indication of their intent in this matter. As I interpret the *Wilshire* case and its successors, the important intent is whether you feel that your advance is to be at the risk of the business or is to be a definite obligation payable in any event. Such an intent cannot be determined merely by understanding what the parties decided to call their advancements. This intent must be determined by looking at the various factors discussed above and weighing them to determine what was really in the minds of the parties making the advances. Therefore, *Wilshire's* intent test is really just a short form of the weighing of factors tests in *Kruse* and *Lundgren*.

In our case the amounts in question were called loans, but the taxpayer and its shareholders do not seem to have treated them as such beyond the barest formalities. Although there was testimony that tax avoidance was not a motive for this approach, there was never any statement of reasons to distinguish the stocks from the notes. Interest payments were deferred on occasion. Prin-

cipal was not repaid and maturity dates were extended. While there was a right to enforce payment, there was also considerable testimony that it would not be exercised under any normal circumstances. The notes were not protected by collateral, an acceleration clause, or a sinking fund. In addition, the notes were quickly subordinated to the only other creditor of the taxpayer. The shareholders never received dividends from a profitable venture, but instead took interest on their notes which, for most of the time, were equal in amount and in proportion to their shareholdings. In addition to this array of technical factors there is an atmosphere created by the testimony which indicates that all advances were treated in the same way. The same parties owned the stock, loaned the money, and managed the business. There were delays in issuing the notes and the stock certificates; yet no one seemed to care. Mr. Lantz testified that they expected to be repaid but that business changed. Their attitudes toward the loans seem to negate that testimony but, even if it is true, the expectation surely died before the tax years in question, since these notes did not have maturity dates after 1960. The case of Cuyuna Realty Co. v. United States, 382 F.2d 298 (Ct.Cl.1967) sets forth the proposition that intent may change and thus the character of an advancement could also change. Surely by 1963 and 1964, and I believe sooner, the character of the advances was that of an investment.

I am cognizant of the liberal attitude taken by the Ninth Circuit in allowing a taxpayer to allocate his funds as he chooses between debt and equity. That, however, is only support for a position that a corporation may choose legitimate debt if it wishes. Here debt was not chosen.

Judgment will be for the defendant. The findings of fact and conclusions of law set forth in this memorandum of decision shall constitute the findings and conclusions required by Rule 52 F.R.Civ.

P. Counsel for the defendant is directed to prepare, serve and lodge a formal order pursuant to Rule 7 of the Rules of this court.