GEORGIA-PACIFIC CORPORATION, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9074–72.    Filed March 31, 1975.

*Maurice O. Georges,* for the petitioner.
*Gary DeFrang,* for the respondent.

HALL, *Judge:* Respondent determined that petitioner is liable as a transferee for a deficiency of $74,097 determined against the Multi-Colortype Co. for its taxable year 1968.

The issues to be decided are:

(1) Whether all or any of the Multi-Colortype Co.'s advances in July 1964 and September 1967 to its wholly owned subsidiary represent capital contributions rather than loans; and

---

(2) Whether the Multi-Colortype Co. must report as income its excess loss account with respect to the stock of its subsidiary as the result of the disposition of that stock.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Georgia-Pacific Corp. (GPC), a Georgia corporation, maintained its principal office in Portland, Oreg., when it filed its petition herein. GPC is the transferee at law of the Multi-Colortype Co. (Colortype), and is liable for any deficiency in income tax determined to be owed by Colortype, plus interest thereon as provided by law.

Colortype, an Ohio corporation, was organized in 1918. During the year in issue (1968), Colortype had 104 stockholders, and no individual or family owned in excess of 25 percent of its stock. It kept its records and filed its returns on a calendar year and used the accrual method of accounting. It filed its 1968 income tax return with the Internal Revenue Service Center in Covington, Ky. On January 8, 1969, Colortype transferred all of its assets to GPC in exchange for GPC common stock and GPC's assumption of its liabilities pursuant to a section 368(a)(1)(C) reorganization. Colortype then liquidated by transferring the GPC stock to its shareholders in redemption of their Colortype stock.

Colortype was engaged in the commercial printing business. On April 30, 1964, Colortype entered into an agreement with Standard International Corp. (Standard) to purchase the assets of Standard's McDonald Printing Division for $1 million cash. In April 1964, Colortype organized the McDonald Printing Co., Inc. (McDonald), an Ohio corporation, to receive the assets acquired from Standard and to conduct the printing business formerly handled by the McDonald Printing Division of Standard. In June 1964, Colortype contributed $400,000 to McDonald in exchange for 100 shares (representing 100 percent) of McDonald common stock. McDonald was and remained the sole subsidiary of Colortype until Colortype was dissolved.

On June 23, 1964, Colortype assigned all its interest in the April 30, 1964, agreement with Standard to McDonald, and McDonald undertook to discharge Colortype's remaining obligations thereunder. On June 26, 1964, McDonald borrowed $1,200,000 from the Fifth Third Union Trust Co. (Fifth Third) of Cincinnati to enable McDonald to complete the purchase from

Standard. On July 1, 1964, Colortype advanced $700,000 to McDonald (July 1964 advance) in exchange for a promissory note payable 2 years from execution and bearing interest at 4½ percent per annum. McDonald immediately used the $700,000 advance to reduce the balance owed Fifth Third to $500,000.

On November 1, 1964, McDonald repaid $100,000 principal of the July 1964 advance from Colortype. On November 2, 1964, McDonald borrowed an additional $200,000 from Fifth Third, increasing its total loan from Fifth Third to $700,000.

On July 30, 1965, McDonald and Fifth Third entered into a loan agreement (term loan agreement) whereby Fifth Third agreed to loan McDonald not to exceed $1,100,000, to be borrowed from time to time but prior to April 1, 1966. From July 30, 1965, through December 31, 1966, McDonald borrowed and repaid funds pursuant to the term loan agreement so that on December 31, 1966, the outstanding balance owed Fifth Third was $1 million. The $600,000 balance of Colortype's July 1964 advance remained unpaid during this period.

The term loan agreement with Fifth Third provided in part:

Borrower [McDonald] further covenants and agrees that from and after the date hereof and while the note of Borrower hereinabove contemplated shall be outstanding, Borrower will not, without the written consent of the Bank [Fifth Third]—

(h) Maintain, incur or create any indebtedness whatsoever other than:
* * *
(8) indebtedness consented to by Bank and subordinate and subordinated to Bank which by its terms cannot jeopardize or hinder payment of this loan to Bank;

At the July 19, 1967 meeting of McDonald's board of directors, an income statement for McDonald for the 6-month period ending June 30, 1967, was presented. This statement reflected a $93,295 loss. A projected statement of McDonald's income for the last 6 months of 1967 was also presented. The projection was that McDonald would realize a small profit for the year. However, by July 31, 1967, the loss for the year had grown to $220,000, and by September 1967 McDonald's cash position had become severely depleted. McDonald sought to borrow more cash from Fifth Third. Fifth Third refused to loan additional funds directly to McDonald, but agreed to loan money to Colortype, which Fifth Third understood Colortype would in turn loan to McDonald. In September 1967 Colortype borrowed

$300,000 from Fifth Third and then advanced that sum (September 1967 advance) to McDonald. Fifth Third agreed to a limited release of McDonald from the term loan agreement subordination requirement; on maturity of the September 1967 note payable by Colortype to Fifth Third, McDonald would be permitted to repay its $300,000 loan from Colortype, which would then repay its $300,000 loan to Fifth Third.

In connection with the application for the $300,000 loan which Fifth Third made to Colortype in September 1967, Mr. Stryker, president of McDonald and Colortype, represented to the bank that the money obtained by Colortype would be loaned to McDonald, and that the loan was intended for the temporary use of McDonald. Mr. Stryker did not represent to the bank that the loan was to be contributed to the equity capital of McDonald.

Colortype paid off the September 1967 note to Fifth Third in December 1968 out of its own funds without receiving any payment from McDonald on its September 1967 advance. McDonald made all its required payments to Fifth Third on its outstanding loans from the bank. McDonald made final payment on its bank loan after the 1969 reorganization.

Colortype accrued interest income on both the July 1964 and September 1967 advances and McDonald accrued corresponding interest expense through 1968. McDonald paid the accrued interest expense through the year 1967. The books and records, financial statements, corporate minutes, and tax returns of both Colortype and McDonald characterized and treated Colortype's July 1964 and September 1967 advances as loans. Neither the shareholders nor the board of directors of Colortype authorized or approved a contribution by Colortype to the equity capital of McDonald other than the $400,000 which was contributed to McDonald in June 1964. Prior to the trial of this proceeding, neither of these corporations treated the advances as anything other than loans.

Mr. Stryker, president of McDonald and Colortype, felt that the financial statements of McDonald and Colortype which characterized the July 1964 and September 1967 advances as loans reflected the true financial structure of these two corporations, and that the shareholders of these two corporations could rely on the financial statements as reflecting the true financial structure of the corporations.

Records of Fifth Third characterized Colortype's July 1964 and September 1967 advances as loans.

During the period 1964 through 1967 McDonald realized the following taxable income and losses:

| | | | |
|---|---|---|---|
| 1964 | ($21,127.18) | 1966 | $195,544.86 |
| 1965 | 138,853.05 | 1967 | (516,550.00) |

McDonald incurred heavy research and development expenses to reacquire some of Proctor & Gamble Co.'s lost business. These expenditures contributed to the losses McDonald experienced in 1967 and 1968.

On October 5, 1971, petitioner submitted to respondent a balance sheet for McDonald as of December 31, 1968, which compared the book value and fair market value of McDonald's assets and listed its liabilities. This balance sheet represented that Colortype's investment in the equity capital of McDonald was in the amount of $400,000. The assets, liabilities, and stockholder equity set forth on the balance sheet are as follows:

| | Book value | Fair market value | Difference |
|---|---|---|---|
| Total assets | $2,272,269.77 | $3,085,468.38 | $813,198.61 |
| Total liabilities | 2,508,194.15 | 2,508,194.15 | 0 |
| Capital stock | 400,000.00 | 400,000.00 | 0 |
| Retained earnings | (635,924.38) | 177,274.23 | 813,198.61 |

Colortype and McDonald filed consolidated returns for 1968. Based on separate returns for 1968, McDonald lost $566,024. Colortype and McDonald did not file consolidated returns for the period January 1 to January 7, 1969 (i.e., prior to the reorganization). After the reorganization, McDonald elected to file a consolidated return with petitioner for the remainder of 1969.

McDonald owed Colortype $45,446 as interest with respect to the July 1964 and September 1967 advances as of December 31, 1968. This amount was treated as an asset of Colortype and contributed to McDonald by petitioner at the time of the reorganization.

In computing Colortype's $312,682.98 excess loss account with respect to its McDonald stock, respondent, in his statutory notice of liability, assigned a basis of $400,000 to Colortype's investment in the stock of McDonald.

ULTIMATE FINDINGS OF FACT

Colortype advances to McDonald in July 1964 and September 1967 were loans rather than contributions to capital.

Colortype had an excess loss account of $312,682.98 with respect to its McDonald stock on January 8, 1969, prior to giving effect to any recapture thereof.

OPINION

### 1. *Loans to McDonald*

The first issue we must decide is whether all or any part of Colortype's advances to McDonald in July 1964 and September 1967 represent capital contributions rather than loans. If they are contributions to capital, then under the consolidated return regulations in effect for 1968 they offset the excess losses of McDonald used in the computation of the affiliated group's consolidated income. Petitioner argues that both such advances became equity before 1968, Colortype's taxable year in issue. Respondent maintains that both advances were loans and remained loans through 1968. We agree with respondent.

The issue of whether an advance to a corporation is debt or equity is a question of fact. *A. R. Lantz Co. v. United States*, 424 F. 2d 1330, 1334 (C.A. 9, 1970); *Diamond Bros. Co. v. Commissioner*, 322 F. 2d 725, 730 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. There are no precise guidelines for making this determination. "The answer depends on the particular circumstances of each case." *Lundgren v. Commissioner*, 376 F. 2d 623, 626 (C.A. 9, 1967), reversing a Memorandum Opinion of this Court.

Respondent argues that petitioner, as Colortype's transferee, is bound by the form in which Colortype cast the advances (*Sterno Sales Corporation v. United States*, 345 F. 2d 552 (Ct. Cl. 1965)), that is, as loans. Until the trial in this case, there was no indication that the advances which Colortype made to McDonald were anything other than loans and for all purposes Colortype treated and characterized the advances as loans. While a taxpayer must in other contexts normally accept the tax consequences of the way in which he deliberately chose to cast his transaction, advances of the type here involved must be characterized in terms of economic reality for the year at issue. *Wilshire & Western Sandwiches, Inc. v. Commissioner*, 175 F. 2d 718, 721 (C.A. 9,

1949), reversing a Memorandum Opinion of this Court; *J. A. Maurer, Inc.,* 30 T.C. 1273, 1289 (1958).

Changing circumstances as time passes may alter the original character of an advance and transform it into equity. See *Cuyuna Realty Co. v. United States,* 382 F. 2d 298, 301 (Ct. Cl. 1967); *A. R. Lantz Co. v. United States,* 283 F. Supp. 164, 170 (C.D. Cal. 1968), affd. 424 F. 2d 1330 (C.A. 9, 1970). Therefore, the taxpayer was not bound by the form in which it cast this transaction. Nevertheless, we cannot agree with petitioner that the advances were transformed into equity after they were made in July 1964 and September 1967 and before the year in issue, 1968.

There is no one characteristic which can be said to be decisive in the determination of whether obligations are for tax purposes debt or equity. *John Kelley Co. v. Commissioner,* 326 U.S. 521, 530 (1945), reversing 146 F. 2d 466 (C.A. 7, 1944), which reversed 1 T.C. 457 (1943). Various Courts of Appeals have identified a number of factors which to varying degrees influence the resolution of the debt-equity issue. *Estate of Mixon v. United States,* 464 F. 2d 394 (C.A. 5, 1972) (13 factors); *A. R. Lantz Co., Inc. v. United States,* 424 F. 2d 1330 (C.A. 9, 1970) (11 factors); *Fin Hay Realty Co. v. United States,* 398 F. 2d 694 (C.A. 3, 1968) (16 factors); *Tomlinson v. 1661 Corporation,* 377 F. 2d 291 (C.A. 5, 1967) (11 factors). Each case must be decided on its own facts and there are so many combinations of factual circumstances that precedents in factual cases are usually of little value.

We shall consider some of the factors identified by the various Courts of Appeals:

1. *Intent of the parties.*—The action of the parties prior to litigation indicates that they intended to establish and maintain viable debts as a result of the July 1964 and September 1967 advances. The books and records of both Colortype and McDonald characterized the advances as loans. The regular accrual and payment of interest on the advances show that Colortype and McDonald considered the advances to be loans, not equity. In addition, there was one $100,000 repayment of the advances. McDonald's failure to make further payments was in part due to the subordination of Colortype's advances to Fifth Third's loan. For the advances to be loans, a strict insistence on a payment due date is not necessary. *Wilshire & Western*

*Sandwiches v. Commissioner*, 175 F. 2d 718, 720–721 (C.A. 9, 1949). The advances were not placed at the risk of the business, for the fair market value of McDonald's assets greatly exceeded its debts, and, in any event, many creditors rely upon the earning capacity of a borrower for the repayment of their loans. *Miller's Estate v. Commissioner*, 239 F. 2d 729, 732 (C.A. 9, 1956), reversing 24 T.C. 923 (1955); *Baker Commodities, Inc.*, 48 T.C. 374, 396–398 (1967), affd. 415 F. 2d 519 (C.A. 9, 1969), certiorari denied 397 U.S. 988 (1970).

Colortype told its stockholders that the advances were loans; it told Fifth Third that the September 1967 advance was a loan; and it represented to respondent on its income tax returns that the advances were loans.

Petitioner argues that there was a change in the intent of the parties to the advances sometime between the date of the advances (July 1964 and September 1967) and the year in question (1968). Petitioner has failed to carry its burden of proof that such a change of intent took place.

2. *Identity between parties to the advances and participation in management by holder of the debt instrument.*—Colortype was the sole shareholder of McDonald. Howard F. Stryker was president and chief executive officer of both Colortype and McDonald. Advances made to a corporation by its sole shareholder are more likely to be committed to the risk of the business than are advances made by creditors who are not shareholders of the corporation. The sole shareholder is also less likely to demand the normal safeguards with respect to its investments than would a nonshareholder. When there is an overlap of management, a parent is probably more likely to commit funds to the risk of the subsidiary's business than where there is no overlap in management. However, bona fide loans to a corporation from its sole shareholder are not treated as contributions to capital for tax purposes (*Wilshire & Western Sandwiches v. Commissioner, supra*), and we have found as a fact that the advances in issue were intended to be loans.

3. *Ability of McDonald to obtain outside funds.*—Subsequent to the execution of the July 1965 term loan agreement with Fifth Third, McDonald was unable to obtain debt financing from outside sources without the consent of Fifth Third. In September 1967 McDonald asked Fifth Third for a $300,000 loan, and Fifth Third refused. Instead, Fifth Third loaned the $300,000 to

Colortype, and the $300,000 was deposited in the McDonald account and constituted Colortype's September 1967 advance. Because of McDonald's financial condition and the requirements of the term loan agreement, McDonald was unable to obtain debt financing from lenders other than Fifth Third. While these factors suggest that the September 1967 advances were committed to the risks of McDonald's business, they are insufficient alone to overcome the other evidence presented indicating bona fide loans were intended and in fact existed through the year in issue, 1968.

4. *"Thinness" of capital structure.*—Petitioner offered no evidence with respect to the "thinness" of McDonald's capitalization. The original capital investment of $400,000 was by no means nominal.

5. *Risk involved.*—During 1967 and 1968 McDonald was experiencing financial difficulties. McDonald incurred heavy research and development expenses to reacquire some of Proctor & Gamble Co.'s lost business, and those expenditures had a bearing on the losses McDonald experienced in 1967 and 1968. McDonald had generated profits prior to 1967, and petitioner, in acquiring the business, hoped it would generate profits again. However, in fact it experienced nothing but losses from the time of acquisition until it was liquidated in 1971. Nonetheless, we find that in 1968 the advances remained loans, and all parties (Colortype, McDonald, and petitioner) expected McDonald to become again a profitable corporation able to repay its debts.

6. *Formal indicia of indebtedness.*—McDonald gave Colortype a promissory note in exchange for the July 1964 advance. The note was not paid when due nor was the note formally renewed. No legal instrument was exchanged in connection with the September 1967 advance. However, the bookkeeping entries of McDonald and Colortype, their tax returns, and Colortype's representations to Fifth Third all indicate the advances were loans.

7. *Relative position of Colortype as to other creditors regarding payment of interest and principal.*—The subordination of Colortype's advances to McDonald to Fifth Third's term loan agreement had a material effect on the collectibility of Colortype's advances. On the other hand, McDonald accrued an interest expense and Colortype accrued interest income on their books through 1968, while McDonald paid Colortype the

amounts accrued as interest expense for all years except 1968. Throughout 1968 the fair market value of McDonald's assets exceeded McDonald's liabilities. McDonald's accrued unpaid interest of $45,446 owed Colortype on its advances was treated as an asset at the time of the reorganization.

8. *Voting power of holder of the instrument.*—As sole shareholder of McDonald, Colortype held 100 percent of the voting power of McDonald.

9. *Provision for a fixed rate of interest.*—The July 1964 note from McDonald to Colortype provided for interest at the rate of 4½ percent per annum. Colortype accrued interest income on both the July 1964 and the September 1967 advances, and McDonald accrued corresponding interest expense. Interest is an incident of a loan rather than a capital contribution.

10. *Contingency on the obligation to repay.*—The promise of McDonald to repay Colortype the July 1964 advance was unconditional as shown on the promissory note. Petitioner has not shown to the satisfaction of the Court that the same was not also true with respect to the September 1967 advance.

11. *Source of interest payments.*—The record does not indicate the source of the interest payments made on the July 1964 and September 1967 advances.

12. *Presence or absence of a fixed maturity date.*—The July 1964 promissory note specified repayment on or before 2 years from date of execution. The evidence presented does not establish whether or not a new maturity date was set, or what maturity date, if any, there was for the September 1967 advance.

13. *Timing of the advances with respect to the organization of the corporation.*—In June 1964, Colortype contributed $400,000 to McDonald in exchange for its stock. In July 1964 Colortype advanced $700,000 to McDonald. McDonald used the $400,000 contribution to capital plus a loan of $1,200,000 from Fifth Third on June 26, 1964, to purchase the assets of the McDonald Printing Division of Standard International Corp. McDonald used the entire July 1964 $700,000 advance to reduce the Fifth Third loan from $1,200,000 to $500,000. While the July 1964 loan was made at or about the time of the organization of McDonald, we find it to be a bona fide debt. We find the parties intended both the July 1964 and the September 1967 advances to be loans and consistently so treated them through the year 1968.

Considering all of the above factors, we conclude that the July 1964 and the September 1967 advances, clearly loans at their inception, had not lost their character as such by 1968, the year in issue. In essence, petitioner is arguing that mere economic misfortune, rendering repayment increasingly improbable, suffices to convert bona fide loans into equity even though there is no concrete demonstration of any changed intent. We do not believe that it is so easy for a loan to become equity. See *Imperial Car Distributors, Inc. v. Commissioner,* 427 F. 2d 1334 (C.A. 3, 1970), reversing a Memorandum Opinion of this Court. Petitioner has not carried his burden of persuading us that the loans were converted to equity before or during 1968.

## 2. *Consolidated Return Regulations*

Petitioner contends that portions of consolidated return regulations section 1.1502–19, as in effect for the period in issue, relating to the disposition of subsidiaries with respect to which excess loss accounts existed, were invalid. Respondent argues that such portions of the regulations are valid, and we agree.

Section 1501,[1] granting the privilege of making consolidated returns, provides:

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

Section 1502 gives the Secretary of the Treasury authority to prescribe regulations with respect to the making of consolidated returns, as follows:

The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

The Secretary of the Treasury promulgated regulations section 1.1502–19 pursuant to section 1502. That regulation requires that:

Immediately before the disposition.* * * of stock of a subsidiary, there shall be included in the income of each member disposing of such stock that member's excess loss account * * * with respect to the stock disposed of. [Sec. 1.1502–19(a)(1), Income Tax Regs.]

We have found as a fact that Colortype's investment in the stock of McDonald was $400,000, and that on December 31, 1968, it had an excess loss account (as defined in section 1.1502–32, Income Tax Regs.) with respect to this stock of $312,682.98 (the excess of McDonald's losses of $712,682.98 which were taken into account in computing consolidated taxable income over Colortype's $400,000 basis in McDonald stock). Under the facts of this case, the regulations provide that the excess loss account of $312,682.98 is treated as capital gain when the subsidiary's stock is disposed of. Sec. 1.1502–19(a)(2)(i), Income Tax Regs.

Petitioner first argues that Treasury regulations section 1.1502–19(a)(1) is invalid in that there is no excess loss to be taken into account until the total losses of McDonald which have been utilized in accounting for the consolidated income exceed Colortype's loans to McDonald as well as Colortype's basis in McDonald stock.

We note at the outset the well-settled principle that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with the administration of these statutes which should not be overruled except for weighty reasons." *Commissioner* v. *South Texas Co.,* 333 U.S. 496, 501. See also *Bingler* v. *Johnson,* 394 U.S. 741, 749–750; *Fawcus Machine Co.* v. *United States,* 282 U.S. 375, 378; *Boske* v. *Comingore,* 177 U.S. 459, 470; *Brewster* v. *Gage,* 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner,* 314 U.S. 326, 336–339; *Colgate Co.* v. *United States,* 320 U.S. 422, 426; *William F. Sanford,* 50 T.C. 823, 832, affirmed 412 F. 2d 201 (C.A. 2), certiorari denied 396 U.S. 841. Here, the Secretary or his delegate had authority to promulgate regulations with respect to the making of a consolidated return, not only under the general rule-making power granted in section 7805, I.R.C. 1954, but also under the specific provisions of section 1502. This gives "added reasons why interpretations of the Act and regulations under it should not be overruled by the courts unless clearly contrary to the will of Congress," *Commissioner* v. *South Texas Co.,* 333 U.S. 496, 503, particularly,

where, as here, the consolidated return regulations, "unlike ordinary Treasury Regulations, are legislative in character and have the force and effect of law." *Union Electric Co. of Missouri* v. *United States,* 305 F. 2d 850, 854 (Ct. Cl.).

*Regal, Inc.,* 53 T.C. 261, 263–264 (1969), affirmed per curiam 435 F. 2d 922 (C.A. 2, 1970.)

Affiliated corporations are granted the privilege of filing consolidated returns upon the condition that they consent to the consolidated return regulations prior to the last day for filing their return. Sec. 1501. Colortype and McDonald consented to and agreed to be bound by these regulations, including section 1.1502–19, when they filed their consolidated returns for 1968. Notwithstanding their consent to the regulations, they are not prevented from challenging the validity of arbitrary provisions in the regulations. Generally, petitioner must show that the regulations are inconsistent with the statute (see *Corner Broadway-Maiden Lane, Inc. v. Commissioner,* 76 F. 2d 106 (C.A. 2, 1935), reversing 29 B.T.A. 762 (1934)), or arbitrary and capricious to challenge them successfully.

Petitioner has failed to prove that section 1.1502–19, Income Tax Regs., is either inconsistent with the statute or arbitrary and capricious. The parties knew or should have known when they elected to file a consolidated return that under the regulations only Colortype's stock investment in McDonald, and not its loans to McDonald, would be available on disposition of the stock to offset McDonald's excess losses used in computing the consolidated income. They did not have to elect to file a consolidated return. They must now take the bitter with the sweet.

Regulations section 1.1502–19 was amended, effective for periods after August 25, 1971, to allow what petitioner here seeks, namely, the right to offset loans as well as capital investment against losses of a subsidiary used in the computation of consolidated income.[2] As issued in proposed form on August 25, 1971, this regulation would have been retroactive, thereby curing petitioner's problem. However, the final regulation was made

---

[2] Sec. 1.1502–19(a)(6), Income Tax Regs., effective after Aug. 25, 1971, states in part:

If there is a disposition (as defined in paragraph (b) of this section) after August 25, 1971, of stock of a subsidiary, *all or any part of the excess loss account with respect to such stock may be applied to reduce the basis of any other stock or obligations of the subsidiary (whether or not evidenced by a security) held by the disposing member immediately before the disposition.* Only the excess loss account which remains after such application shall be included in income under this paragraph. * * * [Emphasis added.]

applicable only to dispositions on or after August 25, 1971. Petitioner's disposition was deemed to have taken place on December 31, 1968, under regulations section 1.1502–19(b)(2)(vi). It is therefore clear that respondent has deliberately chosen to deny to petitioner and those similarly situated the benefits of the new, more liberal rule.

Petitioner urges strenuously that such denial is beyond the respondent's power because failure to permit use of the loss account against loans is failure to heed the statutory mandate that the consolidated return regulations must "clearly reflect the income-tax liability," or be necessary to prevent tax avoidance. Sec. 1502. Petitioner says that the pre-1971 treatment was not necessary to prevent tax avoidance and fails to clearly reflect the income of the consolidated group. Respondent replies that there can be more than one way to "clearly reflect income," that it was within respondent's power to issue regulations applying either the pre-1971 or the present method, that issuance of the later regulation did not preclude the possibility that the earlier regulation clearly reflected income, and that petitioner has failed to carry his heavy burden of proof that the original method did not clearly reflect income.

We note at the outset that section 1502, relied upon by petitioner, does not literally state that the regulations must be such as clearly to reflect the *income* of the group, but states rather that they must clearly reflect the "*income tax liability*" of the group "and the various factors necessary for the determination of such liability." It is not at all clear from this language that the regulations must provide methods of accounting which "clearly reflect income" within the meaning of section 446(b).

However, even assuming that petitioner is correct in this view of section 1502, we are unpersuaded by his efforts to show that the pre-1971 method of handling the excess loss account was not a method which clearly reflected income. In the first place, the fact that the present method clearly reflects income does not alone rule out the former method. There can be more than one method meeting this standard. Were this not so, the respondent's discretion to make choices under section 1502 would be largely or wholly illusory. Secondly, while the present method is undoubtedly more humane in most (but not all) instances because it permits a longer deferral of recognition of income, we

do not see why the original method fails to reflect income as clearly. To take a simple illustration, assume parent corporation P invests $50,000 in the stock of subsidiary corporation S and lends S $50,000. S incurs $75,000 of losses which are claimed by P on its consolidated return. S then ceases to be a member of the consolidated group. Under the original method, P has $25,000 of income on the "disposition," but retains its $50,000 basis in the debt. Under the new method, P has no immediate income but reduces its basis in the debt to $25,000. Secs. 1.1502–19, 1.1502–32, Income Tax Regs.; sec. 1.1502–19(a)(6), Income Tax Regs., effective after Aug. 25, 1971. At some subsequent date, if the debt is paid, P will have no income under the old method but will have $25,000 of income under the new method. Likewise, if the debt becomes worthless, P will have a $25,000 greater loss under the old method than the new method. The difference between the methods is therefore simply one of timing. The books will ultimately balance. The new method is no doubt preferable to most taxpayers, because it defers income longer, but we cannot find that petitioner has established that the earlier method fails clearly to reflect income.

Petitioner argues in the alternative that because the reorganization qualified as tax free under sections 361 and 368(a)(1)(C), there can be no gain under regulations section 1.1502–19. This argument, however, misconceives the nature of the gain in question, which was triggered as of December 31, 1968, by the failure of the consolidated group to file any consolidated return together for periods after 1968. Sec. 1.1502–19(b)(2)(vi), Income Tax Regs. The gain is not created by the reorganization as such, and whether the acquisition was tax free or not is beside the point. See sec. 1.1502–80, Income Tax Regs.

*Decision will be entered for the respondent.*